

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-9-1996

# Yohn v. Love

Precedential or Non-Precedential:

Docket 95-1412

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Yohn v. Love" (1996). *1996 Decisions.* Paper 231.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/231

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 95-1412

_____


DAVID LEE YOHN

vs.

WILLIAM J. LOVE; THE ATTORNEY GENERAL OF THE STATE
OF PENNSYLVANIA; THE DISTRICT ATTORNEY OF LEHIGH
COUNTY, PENNSYLVANIA

             District Attorney of Lehigh County,

                      <u>Appellant</u>


_____


Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 94-cv-00524)

_____


Argued
November 28, 1995
Before:  MANSMANN, COWEN and SEITZ, <u>Circuit</u> <u>Judges</u>.

(Filed February 9, 1996)
_____


Richard J. Makoul, Esquire (Argued)
461 Linden Street
Allentown, PA  18102

        Counsel for Appellee


Michael P. McIntyre, Esquire (Argued)
First Assistant District Attorney
Office of District Attorney
P.O. Box 1548
Lehigh County Courthouse
Allentown, PA  18102

        Counsel for Appellant

MANSMANN, <u>Circuit</u> <u>Judge</u>.

The Commonwealth of Pennsylvania brings this appeal from an order of the district court granting a Petition for Writ of Habeas Corpus, filed by David Lee Yohn, a state prisoner currently incarcerated at the State Correctional Institution at Huntington, Pennsylvania. The Commonwealth contends that Yohn is not entitled to habeas relief because no constitutional error occurred when the Chief Justice of the Supreme Court of Pennsylvania became involved in a trial court ruling on the admissibility of evidence.

We find that the district court did not err in holding that the ex parte involvement of the Chief Justice in the criminal trial violated Yohn's right to procedural due process under the fourteenth amendment, and his right to a fair trial under the sixth amendment. We further find that this violation did not constitute harmless error under the standard set forth in <u>Kotteakos v. United States</u>, 328 U.S. 750 (1946).

Therefore, we will affirm the order of the district court granting the writ of habeas corpus. We do not, however, find any authority for the federal district court to order the exclusion of the wiretap evidence upon retrial. Therefore, we will vacate the order of the district court to the extent that it directs that the wiretap evidence be excluded and leave that ruling to the state court upon retrial.

## I.

The relevant facts are not disputed. On January 23, 1985, Andrew Kollar was shot and killed by a single shotgun blast outside his home in Old Zionsville, Lehigh County, Pennsylvania. During its investigation of the incident, the Pennsylvania State Police questioned Gerald Southerland, an individual who reputedly had prior drug dealings with Kollar. Southerland initially denied any knowledge or involvement in Kollar's murder.

Later, accompanied by his attorney, Southerland implicated David Lee Yohn and Donald Lynn as accomplices in an unsuccessful robbery scheme. According to Southerland, since Kollar did not know Lynn, Lynn was recruited to gain entry into Kollar's house under the guise of car trouble. Lynn was to restrain Kollar at gunpoint while Southerland and Yohn entered the house and searched for money. Although Lynn successfully gained entry into Kollar's home, the plan went awry and Kollar, attempting to escape, was shot in the back. Southerland identified Yohn as the shooter.

In exchange for this information and his later cooperation as a prosecution witness, state authorities agreed to charge Southerland only with burglary and permitted him to remain free on his own recognizance. In addition, the deal was conditioned upon the accuracy of Southerland's role in the incident as the "wheelman" and his continued cooperation to assist the prosecution in obtaining evidence which implicated his

3

co-conspirators.  To accomplish this, Southerland agreed to wear a body wire and to meet with Yohn.

On March 15, 1985, Southerland was wired with a reel-to-reel tape recorder and transmitter in anticipation of meeting with Yohn.[0]  Later that day, when Southerland met with Yohn, state police attempted to record their conversation as they travelled to various locations in and around Lehigh County. State police monitored these conversations from a van outfitted with receiving and recording equipment.[0]  Yohn and Lynn were subsequently arrested and charged with murder, robbery, burglary, criminal trespass, crimes committed with firearms, and criminal conspiracy.[0]

Yohn filed a pre-trial motion to suppress the tape of the wiretap conversation on constitutional and other procedural grounds.  This motion was denied by a common pleas judge in an order and opinion filed on September 10, 1985.

Immediately preceding the commencement of voir dire on October 21, 1985, the defense made an oral motion in limine

---

[0]      The reel-to-reel recorder was the primary device relied upon by the state police to record any statements made by Yohn. The transmitter allowed the police to overhear the conversation in addition to serving as a back up for the reel-to-reel recorder.

[0]      The reel-to-reel recorder failed to record any of the conversation and only fragments of their conversation were received and recorded from the transmitter.

[0]      Lynn provided a written statement on March 15, 1985 implicating himself, Yohn and Southerland.  Three days later, Lynn issued a subsequent statement to the police from prison in which he claimed to have seen Yohn holding the shotgun immediately after Kollar was shot.  In return for his cooperation and trial testimony, the Commonwealth agreed to accept his pleas of guilty to third degree murder and attempted burglary.

4

requesting a ruling from the trial court concerning the admissibility of the tape recording of the wiretap or, in the alternative, a ruling which precluded the prosecution from referring to the tape during <u>voir</u> <u>dire</u> and opening statement until the trial court had ruled on its admissibility. The court then held an <u>in</u> <u>camera</u> hearing during which the judge sat in the jury box and listened to the tape while reading a transcript of the recorded conversation prepared by a secretary in the District Attorney's office.[0] The court deferred any ruling until the next morning to enable the court stenographer to submit his rendition of the taped conversation as another means of evaluating the tape's clarity and comprehension.

The next morning, on October 22, 1985, the judge heard arguments in chambers and overruled the defense objection to the statements obtained through the use of the wiretap, but indicated that a satisfactory transcript still needed to be derived. Jury selection then commenced, and during <u>voir dire</u>, counsel for the Commonwealth, as well as for Yohn, questioned potential jurors

---

[0] The tape was approximately thirty minutes long with less than two minutes questionably audible. Certain words and parts of sentences were audible, but there were numerous gaps between words and sentences. Defense counsel argued that these gaps made the fragmented audible portion virtually incomprehensible and unintelligible, resulting in the entire tape being untrustworthy and inadmissible as evidence.

The prosecution conceded that large portions of the tape were inaudible, but contended that one or two minutes of conversation were sufficiently clear so that the jury could understand. The prosecutor argued that in order to facilitate understanding and permit the jury to follow the tape with a minimum of difficulty, the court, prosecution and defense should collectively derive a transcript to be provided to the jury.

5

regarding how they felt about the police obtaining and using wiretap evidence. Counsel for Yohn inquired as to whether they would have any objection to wiretap evidence "if it was garbled, full of problems, inaudible, and very difficult to hear."

Before jury selection continued on the next day, defense counsel asked the court for a clarification of its ruling regarding the admissibility of the tape. Yohn acknowledged that the court's ruling permitted the prosecution to question potential jurors about wiretap evidence; he was uncertain whether the court ruled that the tape would be admissible at trial. Yohn further argued that if the court had ruled the tape admissible, it was obligated to make findings of fact on the record as required by Commonwealth v. Leveille, 289 Pa. Super. 248, 433 A.2d 50 (1981). Yohn also raised the issue of the court's previous dissatisfaction with the transcript.

In response, the trial judge stated that he agreed "that there is more to be resolved in respect to the tape". The court held that the prosecutor would be permitted to continue referring to the tape during voir dire, and that the admissibility issue would be addressed after jury selection.

Trial commenced without any further discussions of, or rulings on, the admissibility of the tape recording. In his opening statement, the prosecutor explained the tape of the wiretap, how it was made and what it would be used to prove. The prosecutor gave his own interpretation of the contents of the tape, telling the jury that the tape would show that Yohn incriminated himself as to the crimes charged.

6

Defense counsel also devoted a portion of his opening statement to the tape recording, advising the jurors that, if permitted to hear the tape, they would discover that nearly all of the recorded conversation was inaudible. Defense counsel explained that the entire wiretap conversation was not sufficiently audible to permit the jury to know what was said or what was intended to be said by the entire conversation. Of the minute or so of barely audible conversation, there were gaps in the sentences so words were left dangling and the jury would not hear the entire sentences. Defense counsel opined that it was the jurors' responsibility to determine what was said on the tape, not what the prosecutor asserted was on the tape. Further, he told them Yohn had an explanation for the words consistent with his innocence.

On October 30, 1985, the Commonwealth called Trooper Robert Gerkin to the stand to testify to his observations of the wiretap conversation. At that point, the judge decided to take up the issue of the admissibility of the tape, retired the jury,[0] and ordered another in camera hearing so a final ruling could be made. The prosecutor expressed his belief that a ruling on admissibility had already been made, and that the only outstanding issue was the preparation of a transcript. To this, the judge replied:

> the transcript bothers me very much and
> initially, given the question to decide, I
> agree I may have made a preliminary ruling.

[0]  Before retiring the jurors, the judge told them that the court had a very important issue to resolve and that it was going to take some time.

7

> But it has always bothered me and I think I
> should give it a more thorough consideration.
> I have real problems with it to be honest
> with you as to whether this new transcription
> is going to help.

Using more sophisticated audio equipment than during the hearing on the initial motion in limine, the Commonwealth again played the tape while the judge sat in the jury box with a court stenographer. The thirty minute tape was played in its entirety and the judge did not have a transcript. The two minute segment that the prosecutor proposed to introduce was then replayed while the judge read the transcript prepared by the prosecutor. After hearing argument, the judge stated on the record that he found the tape to be inaudible when hearing it without the transcript, and was of such poor quality that it would lead to jury speculation as to its contents. Further, the trial judge referred to the tape as an "absolute absurdity" and as "absolutely prejudicial". The judge granted Yohn's motion to exclude the tape recording.

When the trial reconvened the next day, the Commonwealth recalled Trooper Gerken to the stand. Trooper Gerken was the Pennsylvania state police officer who was listening to the wiretap conversation and taking notes as it was being recorded. On offer of proof, the Commonwealth stated that Trooper Gerken would testify to what he heard and the notes he recorded while listening to this conversation. Defense counsel objected to such testimony, arguing that Trooper Gerken's testimony could not be more reliable that the tape recording

8

because he had listened to the conversation through the recording equipment. The judge sustained the objection, ruling that the testimony would have "the same prejudicial effect" as the tape. This argument and ruling took place at a sidebar conference.

Still at sidebar, the prosecutor requested a continuance, stating that he would seek a writ of prohibition from the Pennsylvania Supreme Court. The court denied the request for a continuance and instructed the parties to proceed. In open court, the prosecutor then requested a fifteen minute recess. The judge called counsel back to sidebar, where the prosecutor further strongly expressed his disagreement, prompting the judge to grant the requested recess.[0]

---

[0]

| MR. MAKOUL: | Your Honor -- |
|---|---|
| THE COURT: | This is the trial ruling and let's go. |
| MR. McINTYRE: | We are asking for a recess. |
| THE COURT: | So you are. |
| MR. McINTYRE: | You have to hold me in contempt because I will get a Writ of Prohibition filed right now. |
| THE COURT: | I'm not going to hold you in contempt. |
| MR. McINTYRE: | You have to. I'm getting a Writ of Prohibition. |
| THE COURT: | Don't get so excited. We have a trial ruling. |
| MR. McINTYRE: | You lose most. |
| THE COURT: | What? |
| MR. McINTYRE: | You heard me. |
| THE COURT: | What? |

9

MR. McINTYRE:    I said you lose them most.

THE COURT:       I stand on my trial ruling on this, Mr. McIntyre.

MR. McINTYRE:    I'm asking for a recess. I think we should be allowed the opportunity to have a recess. I want to talk to Bill Platt and decide what we are going to do.

                 Sometimes you just can't take what you have done to us in this case.

THE COURT:       Mr. McIntyre, don't talk so silly. That tape was an absolute absurdity.

MR. McINTYRE:    A witness can't testify to what he heard?

THE COURT:       It has the same prejudicial effect in coming across in bits and pieces in the tape. I saw his transcript. It didn't convince me anymore than that. He would have the same prejudicial effect of taking parts of sentences which were inaudible and had gaps in them and everything else. That has the same prejudicial effect.

MR. McINTYRE:    I see in every case where a witness testifies as to a conversation he overhears. He has to overhear every word; is that your opinion?

MR. MAKOUL:      Your Honor --

MR. McINTYRE:    Can we research this issue, Judge?

THE COURT:       That's not my opinion.

MR. MAKOUL:      The Court has made a ruling. This is clearly improper.

MR. McINTYRE:    And the Court made lots of rulings which it changed its mind on. I'm asking for a recess to get research to you, Judge.

10

MR. MAKOUL:      Your Honor, I'm sorry to hear him carry on like this.

MR. McINTYRE:    I'm sorry to hear you carry on too.

MR. MAKOUL:      Let's proceed with the trial. I think that's my client's right.

MR. McINTYRE:    That's what I asked when you asked to have him reverse himself, let's proceed with the trial. Now I'm asking for a recess to either do that or get research to you because, Judge, it's outlandish to say this man can't testify to what he heard.

MR. MAKOUL:      I object to that kind of bullying and intimidation to the Court. That's outrageous.

THE COURT:       All right. We will give you a recess.

MR. McINTYRE:    Thank you, Judge.

MR. MAKOUL:      May I ask what for, the purpose or reason?

MR. McINTYRE:    I don't think I have to tell you. I stated it on the record.

MR. MAKOUL:      I would like to know.

MR. McINTYRE:    I'm not stating anything to you.

THE COURT:       I don't think he has to let me know. He wants the Court to extend him that privilege and I am. I'll extend it.

                 I think you are overreacting, Mr. McIntyre. You have a coconspirator that testified. You got your tape. The tape was absolutely prejudicial.

MR. McINTYRE:    Later on I'll tell you what I think of you in this case.

MR. MAKOUL:      I don't believe this.

THE COURT:       I don't either.

11

After the recess, the prosecutor informed the court at sidebar that he had placed a call to the chambers of Pennsylvania Supreme Court Chief Justice Robert N.C. Nix and had reached a law clerk. The law clerk advised the prosecutor that the Chief Justice was in conference, but would attempt to contact the trial judge when the conference was concluded. The prosecutor requested a continuance until he was able to speak with the Chief Justice. The request was denied.

The court then granted the Commonwealth's request for an instruction to the jury regarding the exclusion of the tape, informing the jury that he had ordered the tape excluded after originally ruling that it was admissible, and that the jurors were not to believe that the Commonwealth intended to mislead them by referring to the tape in opening statement.[0] Upon request of defense counsel, the court also instructed the jurors that they were not to draw any adverse inferences against Yohn from the fact that they knew a wiretap had occurred. After questioning one additional witness, the Commonwealth rested.

Defense counsel was in the process of questioning his first witness when the court announced, "Something has come up" and the court recessed until after lunch. The judge had been

---

[0] The judge told the jury that when he recessed the court early the previous day, he did so in order to consider the admissibility of the tape of the wiretap conversation between Southerland and Yohn. He told them that defense counsel objected to admitting the tape because it was inaudible and difficult to understand. The court told the jury that before the trial started he had ruled the tape admissible, but after listening to it again on more sophisticated equipment, both with and without a transcript, he determined that the tape was not admissible.

12

notified that the Chief Justice was calling his chambers in response to the telephone call placed earlier by the prosecutor.

The trial judge, the prosecutor and defense counsel proceeded to the trial judge's chambers.[0] The judge and the prosecutor spoke with the Chief Justice on the only two available telephones. Defense counsel did not participate in the conversation.[0] He was standing next to the prosecutor, but was not able to hear any of the Chief Justice's remarks.

The Chief Justice asked the prosecutor to relate what had prompted the call placed to his chambers. The prosecutor explained the background regarding the exclusion of the tape, and the trial judge agreed that the facts as set forth by the prosecutor were essentially correct. The tape was not played for the Chief Justice. At this point, the Chief Justice began speaking to the trial judge. After this conversation concluded, the trial judge told counsel for both parties that he was going to allow the tape to be played for the jury.[0]

---

[0] The proceedings in chambers were not made part of the record.

[0] Defense counsel asserts in his brief and at oral argument that he believed that the topic of the conversation was the Commonwealth's request for a stay to file a writ of prohibition, and therefore, did not feel it was necessary to participate at this point. At oral argument before us, defense counsel stated that he could not have participated in the telephone call had he so desired because the prosecutor was so engrossed in his conversation with the Chief Justice that defense counsel would literally have had to wrestle him to the floor to get the phone.

[0] Defense counsel alleges in his brief that, over the noon recess, he unsuccessfully attempted to contact the Chief Justice for an explanation of the Chief Justice's authority to intervene in a discretionary ruling of the trial court. Defense counsel further asserts that on November 1, 1985, he was able to

13

When court resumed, the judge stated on the record at a sidebar conference "that [at] approximately 20 of 12:00 I received a call from the Chief Justice relative to this case who said to me that regardless of my ruling in respect to the tape that I should defer that ruling and frame the issue and allow the tape to be played.  This I'm sure was a directive from him which the court will abide by."  Defense counsel objected, arguing that he had never been apprised of what had transpired with regard to the Chief Justice's intervention.  The prosecutor related his actions for the record:  "I gave [the law clerk] my version of the fact that we had a pre-trial ruling which permitted me to use the tape and transcript, that I relied on that in giving an opening statement.  After my opening statement the judge changed his mind, the way I look at it."  The prosecutor stated that he informed the law clerk that he wanted the Chief Justice to issue a stay of the proceedings so that he could file a writ of prohibition.

Still at sidebar, the trial judge stated that he did not change his ruling regarding the tape, but that he had "been directed by the Chief Justice to let it in."  Discussion of the

talk to the Chief Justice during the noon recess, at which time the Chief Justice allegedly relayed what he was told by the prosecutor and why he responded the way he did.  When defense counsel asked him how he could do so without defense counsel's participation, the Chief Justice allegedly replied, "That was wrong."  The conversation then came to an end.

These alleged facts are not material to the issue of the violation of Yohn's rights.  In addition, apparently they were not proffered to the district court.  Thus, we have no occasion to consider them.

14

telephone call was completed with defense counsel stating that he understood the trial judge to be "in disagreement with the admissibility of the tape but feels [he] is under a directive of the Chief Justice," to which the judge replied, "Correct." Defense counsel then requested a stay for purposes of seeking review of the Chief Justice's order by the full supreme court; the request was denied.

The jurors were then brought into the courtroom. The court told them that it had now been decided that they were going to hear the tape of the wiretap. The jurors were also told that the tape was thirty minutes long, and that their attention was going to be directed to approximately two minutes of the conversation. They were informed that the prosecutor had prepared a transcript covering the two minutes of conversation at issue. The jurors were instructed not to regard the transcript as evidence, but to consider it as an aid to assist them in following the taped conversation. They were told that the transcript would be collected immediately after the tape concluded. The prosecutor then reopened his case, and the tape was admitted.

On November 5, 1985, the jury found Yohn guilty of felony murder, robbery, conspiracy and related charges. Timely motions for a new trial and in arrest of judgment were filed and heard before an en banc panel of the Court of Common Pleas of Lehigh County on November 3, 1986. In his motions, Yohn alleged that his constitutional rights of due process of law and equal protection of the law were violated when the Chief Justice

15

intervened in the case.  The motions were denied and on June 13, 1988, Yohn was sentenced to life imprisonment and a consecutive term aggregating five to ten years for the non-merged offenses.

Yohn appealed to the Superior Court of Pennsylvania, which affirmed the judgment of the court of common pleas on June 22, 1989.  Commonwealth v. Yohn, No. 01907 Philadelphia 1988. Yohn then filed a petition for allowance of appeal to the Supreme Court of Pennsylvania on July 14, 1989, Commonwealth v. Yohn, No. 656 E.D. Allocator Docket 1989, with a motion for recusal of the Chief Justice.  His main claim, once again, concerned the intervention of the Chief Justice during the jury trial.  Three and one-half years later, on February 19, 1993, the Supreme Court of Pennsylvania issued a per curiam order denying the petition for allowance of appeal.  Neither Pennsylvania appellate court addressed Yohn's claims that the Chief Justice's interference with the trial resulted in violations of his constitutional rights.

Yohn filed a Petition for Writ of Habeas Corpus in the United States District Court for the Eastern District of Pennsylvania, alleging that the Chief Justice interfered without jurisdiction in Yohn's ongoing jury trial by conducting an ex parte telephone conversation with the trial judge, in which the Chief Justice ordered the trial judge to reverse a discretionary ruling to exclude wiretap evidence.  As a direct result of the Chief Justice's interference, Yohn claimed, he was denied a fair

16

and impartial trial in violation of the fifth, sixth, and fourteenth amendments to the United States Constitution.[0]

Yohn's petition was assigned to a magistrate judge for consideration. In his Report and Recommendation, the magistrate judge recommended that the district court grant the petition and order Yohn released from prison unless the Commonwealth affords him a new trial within one hundred twenty days. The Commonwealth filed timely objections to the Report and Recommendation.

The district court issued an order approving the Report and Recommendation of the magistrate judge. In granting Yohn's petition, the district court directed that Yohn be released from custody unless a new trial was commenced within one hundred twenty days from the date of the order. The court also ordered that the new trial be conducted without admission of the tape recorded evidence.

The Commonwealth appeals to us from the district court's order granting the writ.

In a habeas corpus proceeding, the district court's legal conclusions are subject to plenary review, but factual conclusions are subject to review for clear error only. United

---

[0]     Yohn also alleged in his habeas petition that he was denied due process and equal protection under the Constitution as a result of the Chief Justice's wrongful intervention in his appeal to the Pennsylvania Supreme Court. Yohn contends that the Chief Justice originally recused himself from participating in Yohn's Petition for Allocatur and then withdrew his recusal, intervening to influence other justices to deny allocatur. This claim was raised for the first time in the habeas petition.

We need not address the merits of this allegation as our disposition of the first claim moots this issue.

17

States v. Luther, 954 F.2d 910, 911 (3d Cir. 1992).  When, however, the district court does not hold an evidentiary hearing and engage in independent factfinding and the habeas evidence is limited to that contained in the state court record, our review of the district court's decision to grant the habeas petition is plenary.  McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir.), cert. denied, 114 S.Ct. 645, 126 L.Ed.2d 603 (1993).  Because here the district court did not conduct an evidentiary hearing,[0] we will exercise plenary review of the district court's decision granting the writ.

## II.

Criminal defendants in a state court proceeding are entitled to federal habeas corpus relief if they show that their

---

[0]     The Commonwealth argued that it was entitled to an evidentiary hearing to uncover the true facts.  Our review of the entire state court record, including the trial transcripts, shows that there are no relevant facts in dispute.  In federal habeas corpus proceedings, federal courts are required to hold evidentiary hearings only if the state court, after a full hearing, has not found the relevant facts through reliable evidence.  Smith v. Freeman, 892 F.2d 331, 338 (3d Cir. 1989).

In cases where an evidentiary hearing is not mandatory, such as the one before us, the holding of a hearing is left to the discretion of the district court.  See, e.g., deVyver v. Warden, U.S. Penitentiary, 388 F. Supp. 1213, 1215-16 (M.D. Pa. 1974) (even though extensive pleadings in the habeas corpus proceeding raised some issues of fact, no hearing was necessary where such factual issues were not material to the determinative questions of law to be decided, and were not relevant to the resolution of the case); Tijerina v. Thornburgh, 884 F.2d 861, 866 (5th Cir. 1989) (hearing is not required where only questions of law are involved).  In addition, the Commonwealth made no proffer of the anticipated testimony, by way of affidavit or pleading.  Thus, we find that the district court did not abuse its discretion in failing to hold an evidentiary hearing.

18

detention violates the fundamental liberties of the person guaranteed by the U.S. Constitution.  Frank v. Mangum, 237 U.S. 309, 325-26 (1915).  The fundamental liberty at issue here is the right to a fair and impartial trial under the due process clause of the fourteenth amendment, and the several provisions of the sixth amendment.  "The Constitution guarantees a fair trial through the Due process Clauses, but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment, including the Counsel Clause . . . ."[0] Strickland v. Washington, 466 U.S. 668, 684-85 (1984).  The essentials of a fair trial were set forth by the Supreme Court in In re Oliver, 333 U.S. 257, 273 (1948):

> A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense--a right to his day in court--are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.  [footnote omitted]

Our ultimate question is whether the Chief Justice's involvement in an ongoing jury trial, by conducting an ex parte

---

[0] The sixth amendment reads as follows:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

19

telephone conversation with the trial judge and the prosecutor which resulted in the trial judge reversing an earlier discretionary ruling made by the state court to exclude wiretap evidence, violated Yohn's right to a fair trial.

A.

A state criminal trial comports with the due process requirements of the fourteenth amendment "so long as it includes notice, and a hearing, or an opportunity to be heard, before a court of competent jurisdiction. . . ." Moore v. Dempsey, 261 U.S. 86, 94 (1923) (citing Frank v. Mangum, 237 U.S. at 326). We turn initially to these three requirements of procedural due process to determine if they were met in this case.

With respect to the first requirement, adequate notice requires disclosure of all the issues to be discussed and sufficient time to prepare. In re Gault, 387 U.S. 1, 33 (1967). Yohn was certainly aware that the Commonwealth had contacted the Chief Justice to request a stay for the purpose of filing a writ of prohibition with the Pennsylvania Supreme Court. The first time Yohn had notice that the Commonwealth addressed the merits of the admissibility of the tape, however, was after the telephone conversation between the Chief Justice, the trial judge, and the prosecutor had ended. Yohn thus had no advance notice that the merits of the tape's admissibility would be discussed with the Chief Justice. As a result, he had no time to prepare a response to the Commonwealth's de facto "appeal."

20

Because of the ex parte[0] nature of the discussion with the Chief Justice, Yohn was denied a hearing or an opportunity to be heard. The trial judge and the prosecutor talked to the Chief Justice on the only two available telephones. Thus, Yohn's attorney was denied the opportunity to participate in the conversation because of the physical constraints of the equipment in the judge's chambers. Moreover, Yohn's counsel was not informed that the conversation had turned from the prosecutor's request for a stay to a discussion on the merits of admitting the tape. Consequently, Yohn was denied the chance to present an argument to support his position that the trial judge's ruling to exclude the wiretap evidence should stand.

The Commonwealth further contends that since it was not error to admit the tape,[0] and the conversation with the Chief

---

[0] Black's Law Dictionary defines "ex parte" proceeding as any "judicial or quasi judicial hearing in which only one party is heard . . . ." Black's Law Dictionary 576 (6th ed. 1990).

Here, only one party, the Commonwealth, had the opportunity to participate in the telephone conversation, and the subject matter of the phone call went beyond what Yohn's counsel expected would be discussed. In our view, this was clearly an ex parte proceeding.

[0] The Commonwealth points out that both an en banc panel of the court of common pleas and the superior court affirmed the admission of the tape. As noted by the district court, however, the issue of the tape's admissibility is left to the sound discretion of the trial judge, who is in the best position to "determine the audibility of the tape and its trustworthiness as evidence." Commonwealth v. Leveille, 289 Pa.Super. at 253-54, 433 A.2d at 52.

Because the trial judge in this case, prior to the Chief Justice's phone call, exercised his discretion in ruling the tape inadmissible, an appellate court would have been unlikely to reverse it, especially in light of his findings that the tape was inaudible, "an absolute absurdity", and "absolutely

21

Justice merely caused the trial judge to return to his original ruling on the admission of the tape,      there was no constitutional violation.  This argument, however, ignores the basic tenets of procedural due process--notice and a meaningful opportunity to be heard.  Due process is not so much concerned with the result, but with the procedure followed in reaching that result.  Here, Yohn was entitled to have notice that the merits of the tape's admissibility were going to be discussed and to have an opportunity to present his side of the issue.  The denial of these essential elements of procedural due process constitute the violation.  The fact that the tape was ultimately admitted into evidence does not negate the procedural violations which occurred.

We turn now to the third element of due process -- that the opportunity to be heard occur before a court of competent jurisdiction.  This requires an examination of the authority of the Chief Justice's involvement to the extent the material facts of the telephone conversation are not disputed by the parties.[0]

The jurisdiction of the Pennsylvania Supreme Court originates from Article 5, § 2 of the Pennsylvania Constitution (1968).  The general powers of the supreme court are codified at 42 Pa. Cons. Stat. Ann. § 502 (1978).  This section states:
    The Supreme Court shall have and exercise the
    powers vested in it by the Constitution of

prejudicial."  But for the intervention of the Chief Justice, the tape would have been excluded from evidence, and this ruling would most likely have been upheld on appeal.

[0]      We gleaned the relevant, undisputed facts from the notes of testimony recorded at Yohn's criminal trial and from both counsels' briefs and oral argument before us.

22

Pennsylvania, including the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 22, 1722. The Supreme Court shall also have and exercise the following powers:

(1) All powers necessary or appropriate in aid of its original and appellate jurisdiction which are agreeable to the usages and principles of law.

(2) The powers vested in it by statute, including the provisions of this title.

The "powers" of the supreme court "on May 22, 1722" referred to in section 502 are set forth in the historical note to 17 P.S. §41 (now repealed). The Act of 1722 refers to "the said judges, or any two of them . . ." in describing the powers of the supreme court. This language is clear that a single justice would not be vested with the powers set forth in the Act of 1722 and thus could not act alone in exercising the powers conferred to the supreme court in section 502. Section 502 was the law in effect at the time of Yohn's trial and subsequent appeals.

Our conclusion is reenforced by the language in section 726, 42 Pa. Cons. Stat. Ann. (1978), describing the supreme court's jurisdiction in King's Bench matters. Section 726 confers to "the Supreme Court" plenary jurisdiction over issues of immediate public importance. Rule 3309 of the Pennsylvania Rules of Appellate Procedure, 42 Pa. Cons. Stat. Ann., describes the procedure to be followed when one applies for extraordinary

23

relief under 42 Pa. Cons. Stat. Ann. § 726.  Again, the rule specifically refers to "the Supreme Court" in stating that it may grant or deny an application or set it down for argument. Pa.R.A.P. 3309(c).  The note to Rule 3309 indicates that the rule is derived from 42 Pa. Cons. Stat. Ann. §§ 502 and 726, and the first sentence of Section 1, Article 5 of the Pennsylvania Constitution.  Rule 3309 also sets forth the specific procedures to be followed in applying for relief under the supreme court's King's Bench authority, none of which were followed here.  (We detail these procedural infirmities involving Rule 3309 infra at p. _____.)

Section 721 of Title 42, Pa. Cons. Stat. Ann., sets forth the original jurisdiction of "the supreme court."  The statute refers to the collective body of the court in stating that it has original but not exclusive jurisdiction over habeas corpus actions, writs of mandamus or prohibition, and quo warranto petitions.

Another area over which "the supreme court," as a collective body, has jurisdiction is appeals from final orders of the common pleas courts.  42 Pa. Cons. Stat. Ann. § 722 (1980). Under section 722, the supreme court has exclusive jurisdiction in eight types of cases.

The remaining sections which address the jurisdiction of the supreme court, sections 723, 724 and 725 of Title 42, Pa.

Cons. Stat. Ann., refer to the collective body of "the Supreme Court."  None of these sections would apply to this case.[0]

The only instances where the Chief Justice of the supreme court is authorized to act singly are specifically enumerated in the Pennsylvania Constitution, the statutes, and various Rules of Judicial Administration.  The constitutional and the statutory duties were thoroughly reviewed in the case of In Re:  Subpoena Served by the Pennsylvania Crime Commission on the Judicial Inquiry and Review Board, Dated June 7, 1983, Number 83194, and In Re:  Petition for Enforcement of a Subpoena to the Pennsylvania Judicial Inquiry and Review Board, 79 Pa. Commw. 375, 396-98, 470 A.2d 1048 (1983), aff'd, 512 Pa. 496, 517 A.2d 949 (1986) (hereinafter "In Re:  Subpoena").  The Chief Justice, as distinct from the supreme court as a body, is authorized to (1) "preside over the trial of any contested election of the Governor, Lieutenant Governor or Attorney General;" (2) "accept a request from a common pleas court president judge for the designation of a judge from another judicial district to act as the election return board when no one within the district is eligible;" (3) "select four judges to serve on the Pennsylvania Commission on Sentencing;" (4) "appoint a non-judiciary member of the Capitol (sic) Preservation Committee;" and, (5) "review and approve decisions of the Department of General Services regarding the size, character, quantity and method of distribution of

---

[0]     Section 723 involves appeals from the Commonwealth Court; section 724 involves the allowance of appeals from the superior and the commonwealth courts; and, section 725 involves direct appeals from constitutional and judicial agencies.

25

various publications to be printed for use by the `judicial department.'"  Id. at 397-98.  In addition to these duties described in In Re:  Subpoena, supra, there are other references to the Chief Justice in the Pennsylvania Rules of Judicial Administration, 42 Pa. Cons. Stat. Ann., none of which are pertinent here.[0]

Recently, the Pennsylvania Supreme Court adopted formal written internal operating procedures (IOPs).  The IOPs were written to implement Article 5 of the Pennsylvania Constitution, Pennsylvania statutes and Rules of Appellate Procedure, and the customs and traditions of the court.  I.O.P., Article I.  See also Marks and Kaplan, Down the Right Road, 17 Jan. Pa. Law. 21 (1995).[0]  Article II, Section D of the IOPs reinforces the duty of the collective body of the supreme court to adjudicate matters

---

[0]    For example, Rule 506, authorizes the Chief Justice to order a hearing and the attendance of personnel at such hearing held to determine compliance with the directives of the Administrative Office.  Rule 701 authorizes the Chief Justice to assign any consenting retired or former judge and any active judge to temporary judicial service on any court upon request by the president judge.  Rule 706 sets forth the selection process for the Chief Justice, and assignment of the duties of Chief Justice in the event that the Chief Justice resigns or is temporarily unable to perform his duties.  This rule was promulgated pursuant to Article 5, § 10(d) of the Pennsylvania Constitution and 42 Pa. Cons. Stat. Ann. § 325.  Title 20, Pa. Cons. Stat. Ann. § 5511 gives the Chief Justice the power to appoint or authorize a special master in guardianship proceedings when so requested by the presiding judge of the common pleas court where the action is pending.

[0]    Although the IOPs of the Pennsylvania Supreme Court did not become effective until October 1, 1994, they codified, to some extent, the practices and procedures of the court to date.  Moreover, the written IOPs validate our previous conclusion that the collective body of the supreme court is vested with the power to adjudicate matters before it, as distinct from a single justice.

26

before it.  Section D states in relevant part:  "The assignment of a given matter to a single justice is solely for the efficiency of the Court, and neither enhances the power of the assigned justice nor diminishes the duty of the remaining justices as to its proper disposition."

According to the IOPs, the Chief Justice performs the following duties:  (1) presides at case conferences following oral argument, leads the court's discussion, and calls for a tentative vote on the decision in each case; (2) has discretion to alter the assignment order in civil and criminal cases to achieve equal distribution; (3) assigns the case to an individual justice for preparation of a draft opinion (in order of seniority); and (4) conducts various activities relative to the voting on cases.  I.O.P, Article III, sections B(1) and B(3), Article IV, Section A(3).

Of particular relevance is Article VI, I.O.P., entitled, "Motions, Miscellaneous Petitions and Applications for Relief."  This article covers the procedures for handling emergency motions, writs of prohibition and motions invoking the court's King's Bench powers.  Under this article, the Chief Justice is authorized to "prepare memoranda setting forth the positions of the parties, and a recommended disposition." I.O.P., Art. VI, Section B.  Section B further states that a "vote of the majority of those participating is required to implement the proposed imposition."  The Chief Justice is also required to assign two justices on a monthly rotating basis to review emergency petitions, and to publish a calendar of duty

27

assignments. I.O.P., Art. VI, Section C. Thus, there are six situations in which the Chief Justice may act alone under the IOPs.

Article VI also sets forth the circumstances under which a single justice may rule on a motion. Section D states: "A duty justice may entertain and may grant or deny any request for relief which may, under Pa.R.A.P. 123, or 3315 properly be sought by motion, except that a single justice may not dismiss or otherwise determine an appeal or other proceeding." I.O.P., Art. VI, Section D.[0] (Emphasis added.) We note initially that the justice granting or denying relief must be the duty justice. There is no indication in this case that the Chief Justice was the duty justice on October 31, 1985, or that the prosecutor even contacted the prothonotary to determine the name of the duty justice on that particular day.

Second, an application for relief under Rule 123 of the Pennsylvania Rules of Appellate Procedure must be made in writing with proof of service on all parties. It must set forth the basis for the request and the relief sought. Any other party has fourteen days to file an answer to the application. Subsection (e) allows a single judge of an appellate court to entertain and to grant or deny any request for relief so long as the appellate court does not require that such applications be acted upon by the entire court. In this case, the Commonwealth's emergency motion could have been heard by a single justice if it had been

---

[0] Pa.R.A.P. 3315 is not applicable here as it involves the review of stay orders of the superior or commonwealth courts.

28

(1) made in writing and contained the substantive and procedural elements for notice; (2) submitted to the prothonotary for docketing and assignment to a duty justice, and (3) contained a request for a stay of the proceedings. Here, the Commonwealth did not comply with the requirements of Rule 123. The prosecutor did not contact the prothonotary of the supreme court to notify him of the emergency motion. Critically, the telephone conversation exceeded a request for a stay and resulted in an "interlocutory appeal." Such an appeal is not properly sought under Rule 123, but should have been made under Rule 1311. Article IV, Section D of the IOPs specifically prohibits a single justice from dismissing or otherwise determining an appeal.

We turn now to the Pennsylvania requirements for the filing of an appeal, which here would be viewed as an interlocutory appeal. The Commonwealth concedes that it did not comply with the procedural requirements under Pennsylvania law for filing an appeal. Interlocutory appeals by permission are governed by 42 Pa. Cons. Stat. Ann. § 702(b) and Pa.R.A.P., Rule 1311, 42 Pa. Cons. Stat. Ann. In order for the Commonwealth to appeal an interlocutory order under Rule 1311, the trial court must state that its "order involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from the order may materially advance the ultimate termination of the matter. . . ." The trial judge did not issue the required statement in this case. Therefore, the Commonwealth could not pursue an appeal of the trial judge's order under Rule 1311.

29

Rule 301 of the Pennsylvania Rules of Appellate Procedure sets forth the requirements for an appealable order. Generally, an order of court is not appealable until after it has been docketed in the trial court.  Subsection (e) sets forth a special procedure for emergency appeals.  Rule 301(e) provides:

> Where the exigency of the case is such as to impel an immediate appeal and the party intending to appeal an adverse action is unable to secure the formal entry of an appealable order pursuant to the usual procedures, the party may file in the lower court and serve a praecipe for entry of an adverse order, which action shall constitute entry of an appealable order for the purposes of these rules.  The interlocutory or final nature of the action shall not be affected by this subdivision.

Title 42, Pa.R.A.P., Rule 301(e), Pa. Cons. Stat. Ann..  The Commonwealth could have filed a praecipe for entry of an adverse order with the Court of Common Pleas of Lehigh County.  Had it done so, the Commonwealth would then have possessed an appealable order from which an appeal may have been taken as of right under Pa.R.A.P., Rule 311(a)(7), 42 Pa. Cons. Stat. Ann. (1985).[0]

---

[0]     The 1992 amendments to Rule 311, Interlocutory Appeals as of Right, added the following paragraph:

> (d) Commonwealth Appeals in Criminal Cases. In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case but where the Commonwealth asserts that the order will terminate or substantially handicap the prosecution.

The 1992 amendment merely codified the decisional law of the time.  See, e.g., Commonwealth v. Saunders, 483 Pa. 29, 394 A.2d 522 (1978) (Pennsylvania Supreme Court would entertain the

30

As we stated earlier, Rule 3309 sets forth the procedures to be followed in applying for extraordinary relief under 42 Pa. Cons. Stat. Ann. § 726 (King's Bench powers). Rule 3309(a) requires that a written application shall be served on the affected persons and on the clerk of court having subject matter jurisdiction over the application. The adverse party has fourteen days to file an answer. Rule 3309(b). The application and answer, if any, are distributed to the supreme court for its consideration, which may subsequently grant or deny the application or schedule it for oral argument. Rule 3309(c). In this case, there was no written application for relief filed by the Commonwealth. In addition, both the district court and the magistrate judge, relying on Philadelphia Newspapers, Inc. v. Jerome, 478 Pa. 484, 387 A.2d 425 (1978), appeal dismissed, 443 U.S. 913 (1979), found that the extraordinary relief available to the Pennsylvania Supreme Court under King's Bench jurisdiction was not appropriate for exercise in this case. In Philadelphia Newspapers, Inc., the Pennsylvania Supreme Court held that King's Bench jurisdiction is to be invoked sparingly, in matters of public importance, and where the petitioner's rights are clearly demonstrated by the record. 487 Pa. at 494-95. We agree with the magistrate judge and the district court that the facts of this case do not rise to the level of importance needed to invoke King's Bench jurisdiction.

---

Commonwealth's appeal from an interlocutory order where the order effectively caused the termination of the prosecution's case or substantially impaired the presentation of its case.)

31

The remaining vehicle for the Commonwealth's appeal was the writ of prohibition, over which the Pennsylvania Supreme Court is vested with original, but not exclusive, jurisdiction.[0] 42 Pa. Cons. Stat. Ann. § 721. The writ of prohibition involves a proceeding between an inferior court and a superior court, as a result of which the superior court exercises control to prevent the inferior court from exceeding the limits of its powers and jurisdiction. Glen Mills School v. Court of Common Pleas of Philadelphia County, 513 Pa. 310, 314-15, 520 A.2d 1379, 1381 (1987) (citing Carpentertown Coal & Coke Co. v. Laird, 360 Pa. 94, 61 A.2d 426 (1948)); Capital Cities Media, Inc. v. Toole, 506 Pa. 12, 19, 483 A.2d 1339, 1342 (1984). In Capital Cities Media, Chief Justice Nix, writing for the court, stressed that "the writ of prohibition is limited in scope to questions of jurisdiction; the writ will not lie to correct errors of law." 506 Pa. at 18, 483 A.2d at 1342. In the earlier Pennsylvania case on writs of prohibition, Carpentertown Coal & Coke Co., supra, the supreme

---

[0] At trial, the Commonwealth stated that it intended to petition the supreme court for a writ of prohibition. The record reveals, however, that the Commonwealth did not do so.

The appropriate procedure for filing a writ of prohibition is contained in Pa.R.A.P., Rule 3307, 42 Pa. Cons. Stat. Ann. Rule 3307 essentially contains the same requirements as Rule 3309 regarding extraordinary relief. In addition, Article VI, Section A of the supreme court's IOP, which governs applications requesting the original jurisdiction of the supreme court, states that "[n]o motions, petitions or applications will be considered which were not first filed in the office of the prothonotary and thence assigned unless a Rule of Appellate Procedure specifies otherwise." Rule 3307 does not state otherwise. Therefore, the Commonwealth would have to have filed a Petition for Writ of Prohibition with the prothonotary first.

32

court stated that a writ of prohibition "will never be granted where there is a complete and effective remedy by appeal, certiorari, writ of error, injunction, or otherwise."  360 Pa. at 102, 61 A.2d at 430 (citations omitted).

The requirements for granting a writ of prohibition are met by satisfying the two-pronged test set forth in Capital Cities Media.  506 Pa. at 19-20, 483 A.2d at 1339, 1342-43.  A petitioner must show that (1) there is no adequate remedy at law which would afford relief, and (2) there is an "extreme necessity for the relief requested to secure order and regularity in judicial proceedings."  Id.  Under the facts of this case, the Commonwealth had another remedy available to it.  As mentioned previously, the Commonwealth could have filed a praecipe with the Court of Common Pleas of Lehigh County for entry of an adverse order under Rule 301(e) and a subsequent interlocutory appeal under Rule 311(a)(7).  It is unlikely, therefore, that the supreme court would have issued a writ of prohibition given the availability of this avenue of appeal.[0]

Since there is no authority empowering a single justice of the supreme court to intervene in a discretionary ruling of a

_____

[0] Furthermore, the magistrate judge and the district court predicted that because the trial court acted within its discretion in ruling on the admissibility of the tape, the supreme court would not have granted a writ of prohibition.  See Philadelphia Newspapers, Inc., 478 Pa. at 494 n.11, 387 A.2d at 430 n.11 ("[p]rohibition is an extraordinary writ designed to assume regularity in judicial proceedings by preventing unlawful exercise or abuse of discretion").  The function of the writ "is to restrain or prohibit an offending court from continuing its unwarranted conduct when continuation threatens imminent harm to the individual on whose behalf the writ is issued."  Id. (Citations omitted.)

33

trial judge and none of the appropriate appeal mechanisms were followed, the Commonwealth's "appeal" was not held before a court of competent jurisdiction. We, therefore, hold that the district court did not err in finding that Yohn's constitutional rights to procedural due process were violated.

We feel constrained to address a contention by the Commonwealth that the Chief Justice was merely giving advice to the trial judge -- perhaps an expression of collegiality from an experienced judge to assist at a difficult moment. It is irrelevant to our decision whether the Chief Justice's remarks were intended or received as advice or as a directive. What is relevant is that as a result of the Chief Justice's remarks, the trial judge changed his ruling, without according Yohn due process of law. The Constitution does not permit such transgressions, irrespective of well-meaning intention.

B.

We further conclude that the ex parte conversation effectively denied Yohn his sixth amendment right to the assistance of counsel. Unlike our finding in United States ex rel. Reed v. Anderson, 461 F.2d 739 (3d Cir. 1972) (court held pretrial photographic identification by witnesses did not occur at a critical stage of proceedings), the ex parte telephone conversation occurred at a "critical stage" of the trial. "`Critical stages' are those links in the prosecutorial chain of events in which the potential for incrimination inheres or at which the opportunity for effective defense must be seized or

34

foregone." Id. at 742. The only way Yohn's counsel could have effectively defended Yohn's position was to be able to participate contemporaneously in the telephone conversation with the Chief Justice. Yohn's counsel was not able to participate, and, as a direct result of the Chief Justice's remarks, the trial judge changed his ruling.

III.

In addition to finding that a constitutional error occurred during Yohn's trial, we must also find that the error was not harmless in order to grant the habeas relief. Constitutional errors have been categorized as one of two types: structural error or trial error. A structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is per se prejudicial. Arizona v. Fulminante, 499 U.S. 279, 309-310 (1991), reh'g denied, 500 U.S. 938 (1991). Trial error occurs during the presentation of the case to the jury, and may be quantitatively assessed in the context of all other evidence. Brecht v. Abrahamson, 507 U.S. 619, ___, 113 S.Ct. 1710, 1717 (1993), reh'g denied, 113 S.Ct. 2951 (1993). Thus, trial errors are subject to a harmless error analysis. Id. The constitutional error which occurred during Yohn's trial is of the trial type. Therefore, we will review the violation under the harmless error standard.

The Supreme Court most recently spoke to the harmless error standard in O'Neal v. McAninch, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995), clarifying two issues involving the standard. First,

the Court discarded the "burden of proof" requirement in favor of a judicial inquiry: "Do I, the judge, think that the error substantially influenced the jury's decision?" Id. at 995. In phrasing this inquiry, the Supreme Court relied on its earlier decision in Kotteakos v. United States, 328 U.S. 750 (1946). Second, the Court made clear that its holding in O'Neal applies only in the limited situation in which a judge, after a thorough review of the record, remains in "grave doubt" as to the likely effect of an error on the jury's verdict. 115 S. Ct. at 994. The Court explained that by "grave doubt" it meant that, "in the judge's mind, the matter is so evenly balanced that he feels himself in a virtual equipoise as to the harmlessness of the error." Id. Further, "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had `substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." Id.

Kotteakos still applies to determine whether or not the error was harmless. Id. at 995-96. There the Court opined that when the error relates to the minimum amount of evidence necessary to sustain a conviction, so that if eliminated the proof would not be legally sufficient, the prejudice is substantial. Kotteakos, 328 U.S. at 763-64 n.18. In addition, "[i]f, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . ." Id. at 764. The crucial inquiry is the impact of the error on the minds of

36

the jurors in the total setting.  Id.  It is thus inappropriate to ask whether there was sufficient evidence to support the result, apart from the phase of the trial affected by the error. Id. at 765.  The correct inquiry is whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error.  Id.

Framing the harmless error inquiry of Kotteakos in the context of Yohn's trial, we must ask whether the admission of the wiretap evidence had a substantial and injurious effect or influence on the jury's deliberations.  From the trial record, we know that the existence of the tape was repeatedly mentioned to the jury:  initially, during voir dire, when prospective jurors were asked about their beliefs concerning "participant monitoring," and later during the opening statements of the Commonwealth and Yohn's counsel.  The prosecutor told the jury that the tape would show that Yohn incriminated himself in the murder of Kollar.  Yohn's counsel told the jury the tape was barely audible with gaps in sentences.

Certainly the jury was aware of the legal controversy with respect to the admissibility of the tape because of the numerous sidebar conferences and in camera hearings.  First, the trial judge dismissed the jury for the day on October 30, 1985, once again to take up the issue of the tape's admissibility.  The court told the jury that it had a very important issue to resolve and it would take a while.  The next day, the court told the jurors that the important issue that the court needed to resolve and which necessitated their dismissal the previous day was the

admissibility of the tape.  At the request of the prosecutor, the judge gave a curative instruction regarding a change in the ruling on the tape's admissibility.  The judge told the jurors that they were not going to hear the tape, that the Commonwealth did not intend to mislead them, and that they should not draw a negative inference against Yohn because of the tape.  After the intervention of the Chief Justice, the trial judge informed the jurors that the tape was now going to be played; they would be given a transcript of the two minutes at issue, but they were not to regard the transcript as evidence.   The tape was then played and the jurors were given a transcript to assist them in understanding the tape.  The transcript was collected after the tape concluded.[0]  In his closing arguments, the prosecutor again brought up the tape.  He asked the jury to infer that Yohn was the shooter by filling in some of the gaps in the tape with his own words.  The court stenographer's transcript recorded when the tape was played for the jury differs from the prosecutor's version to which he referred in his closing argument.

Besides the wiretap evidence, the only solid evidence incriminating Yohn were the statements and/or testimony of the

---

[0]     The day after the tape was played for the jury, defense counsel, at a sidebar conference, brought up the fact that excerpts from the transcript of the tape appeared in a newspaper article that day.  Apparently, the trial judge admitted showing the transcript to a reporter and discussed it with the reporter. Because the transcript was not part of the record, Yohn's counsel objected, and requested that all of the jurors be polled to ascertain whether any of them had read the article in the newspaper.  After the jury poll, it was determined that none of the jurors had seen the article.

co-conspirators, Lynn and Southerland.[0] The Commonwealth does not dispute the district court's finding that the tape was crucial to its case: the prosecutor needed to have the tape of the wiretap played for the jury in order to validate the statements of the co-conspirators.[0] The credibility of the co-conspirators was called into question because of their status as co-conspirators, and because they entered into a plea bargain with the Commonwealth in exchange for their cooperation.[0] Therefore, the wiretap evidence was crucial to the prosecutor's case.[0] Indeed, because the tape was admitted, Yohn alleges he

---

[0]      In addition to the tape, the Commonwealth offered into evidence numerous exhibits consisting of photographs of the victim, crime scene, pistols, Yohn's and Southerland's homes; ammunition and other shotgun supplies, a 45 cartridge; a certificate evidencing Yohn's ownership of a 45 caliber pistol; drugs; lab and autopsy reports; statements and the preliminary hearing testimony of Donald Lynn; and the statement of Gerald Southerland.

[0]      In his testimony at trial as well as in his statements to police at the time of his arrest, Lynn implicated himself, Yohn and Southerland in the attempted burglary and murder of Kollar. He stated that immediately after he heard the shotgun blast, he ran outside and saw Yohn holding a shotgun. In a statement dated March 14, 1985, Southerland told police that Yohn was the shooter. Neither Lynn nor Southerland, however, actually saw Yohn shoot Kollar.

[0]      In return for his testimony at trial against Yohn, Lynn accepted a plea bargain for third degree murder and attempted burglary. Southerland agreed to wear a body wire to try and elicit incriminating statements from Yohn, and in exchange, was charged only with burglary, not murder. Southerland was released on his own recognizance, subsequently fled the jurisdiction before trial, and thus, was not available to testify. Over the objection of Yohn's counsel, Southerland's March 14, 1985 statement was admitted into evidence.

[0]      We are surprised by the Commonwealth's argument regarding harmless error -- that since the trial judge ruled the tape was inaudible, and if it was truly inaudible, then the tape could not have added anything to the Commonwealth's case. Further, if the tape added nothing to the Commonwealth's case, it

was forced to take the stand to attempt to nullify the prejudice which resulted from the tape.

Applying the Kotteakos standard to these facts we conclude that the error was not harmless.  The prejudice began when the trial court reversed its preliminary ruling, thus excluding the tape.  The jury was left to speculate about what was really on the tape.  Then the tape, which the trial judge found to be inaudible and highly prejudicial, was played for the jury.  Again, the jurors were left to draw their own inferences as to the incriminating nature of the taped conversation.  And, in case the jury was having trouble deciphering those statements on their own, the prosecutor supplied his own incriminating interpretation of the tape recording in his closing argument. Because of all the controversy over the tape throughout the trial, the jury must have believed it was an important piece of evidence.  It is reasonable to conclude, therefore, that the tape substantially influenced the jury's decision.  Thus, the constitutional error was not harmless.

We are not persuaded by the Commonwealth's attempt to analogize the facts of Brecht v. Abrahamson, 507 U.S. 619, 113 S. Ct. 1710 (1993) to Yohn's trial.  The Commonwealth likens the

---

could not have prejudiced the jury and substantially affected their verdict, and thus, the error was harmless.

The Commonwealth's position here is contrary to the very essence of the controversy in the criminal trial which gave rise to this appeal.  Further, the Commonwealth was willing to seek a writ of prohibition to get the tape admitted into evidence, a rather extreme measure for something that the Commonwealth now argues would not add anything to its case.

references made to the tape during voir dire and opening arguments to the state's use in Brecht of petitioner's post-Miranda silence for impeachment purposes. The Commonwealth argues that, when taken in context, the playing of the tape after the jury had already heard from both sides of its existence, and its alleged contents, was completely harmless. Further, the Commonwealth contends that it would have been more harmful not to have played the tape after the jury had already heard of its existence and alleged contents.

We disagree with the Commonwealth's analysis. First, the references to the tape occurred at the beginning of the trial and weighed on the jurors' minds throughout the trial. The misuse of evidence in Brecht occurred at the end of trial, when the petitioner took the stand. Second, the purpose for introducing the tape was to inculpate Yohn, not to impeach his credibility. Finally, it is not sufficiently clear that the evidence of guilt against Yohn was weighty as in Brecht.

## IV.

We turn finally to the appropriateness of the relief fashioned by the district court -- the exclusion of the taped evidence at retrial. The federal habeas statute, 28 U.S.C. §2243, directs the federal courts to act "as law and justice require" in fashioning habeas relief.

While we were not able to find any federal cases directly on point, the Court's opinion in Crane v. Kentucky, 476 U.S. 683 (1986), is instructive. In Crane, the petitioner sought

41

habeas relief to obtain a new trial and to have admitted at retrial, evidence which bore directly on the voluntariness and credibility of his confession. 476 U.S. at 686. The Court acknowledged its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts," id. at 689, citing its prior decisions holding that trial judges must be given "`wide latitude' to exclude evidence that is `repetitive . . ., only marginally relevant,' or poses an undue risk of `harassment, prejudice [or] confusion of the issues.'" Id. at 689-90. Yet, the Court in Crane had little difficulty determining on the facts before it that the exclusion of the evidence deprived the defendant of a fair trial, and thus, ordered the evidence admissible on retrial. Id. at 690-91. From Crane we learn that under the right set of facts, federal habeas courts may fashion a remedy involving an evidentiary ruling which normally is reserved for the trial judge.

Here, the district court felt that permitting the introduction of the tape at retrial "would, in essence, render the habeas proceeding a nullity by vindicating Yohn's constitutional rights in the abstract while having no practical effect." The district court opined that, "but for the violation, Yohn would have been tried without the tape's admission into evidence." While the latter statement is true, we cannot find support in either the caselaw or the facts for such a remedy here.

Discretionary rulings regarding the admissibility of evidence are still best left to the province of the trial judge.

42

The underlying basis of this habeas proceeding is Yohn's initial motion in limine, questioning the audibility of the tape. Unlike Crane, Yohn was not seeking to admit exculpatory evidence, but rather, was attempting to exclude evidence which, he claimed, was highly prejudicial. Yohn questioned the tape's trustworthiness and its prejudicial effect on the jury, since the tape was barely audible, with substantial gaps in sentences. The state trial judge remains in the best position to make that determination. Hopefully, on retrial, the mistakes that were made during the first trial will not be repeated. We are confident that the trial judge assigned to Yohn's retrial will deal with this issue in a more timely manner to avoid the procedural problems encountered the first time.

One final matter bears mention. Earlier in this opinion, we quoted at length the exchange chiefly between the prosecutor and the trial judge. Without question, this is the most caustic and disrespectful confrontation by a prosecutor this court has read. Despite the resulting difficulties and the passage of time, it was clear at oral argument before us that the prosecutor had not the slightest remorse for his personal affront to the trial judge. We take this opportunity to remind him of his responsibilities as an officer of the court and that effective counsel can disagree without being disagreeable.

V.

43

For the reasons set forth above, we will affirm the district court's order granting the Writ of Petition for Habeas Corpus, unless the state court affords Yohn a new trial within one hundred and twenty days from the date of the final judgment of this court. We will vacate that part of the order which directs the exclusion of the tape-recorded evidence upon retrial.