

1998 Decisions

11-9-1998

# Hassine v. Zimmerman

Precedential or Non-Precedential:

Docket 97-1969

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Hassine v. Zimmerman" (1998). *1998 Decisions.* Paper 260.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/260

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 9, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1969

VICTOR HASSINE,
        Appellant

v.

CHARLES ZIMMERMAN, Superintendent, and THE
ATTORNEY GENERAL OF THE STATE OF PENNSYLVANIA

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 86-6315)

Argued: August 4, 1998

Before: NYGAARD, ALITO, and RENDELL, Circuit Judges

(Opinion Filed: November 9, 1998)

        Donald J. Goldberg (Argued)
        Leslie H. Smith
        Ballard Spahr Andrews &
         Ingersoll, LLP
        1735 Market Street, 51st Floor
        Philadelphia, PA 19103-7599
         Attorneys for Appellant

        C. Theodore Fritsch, Jr. (Argued)
        Stephen B. Harris
        Alan M. Rubenstein
        District Attorney's Office
        Bucks County Courthouse, 4th Floor
        Doylestown, PA 18901
         Attorneys for Appellees

OPINION OF THE COURT

RENDELL, Circuit Judge:

On January 4, 1983, a Pennsylvania state court sentenced Victor Hassine to life in prison, following his 1981 conviction on charges of first degree murder, attempted murder, criminal conspiracy, and criminal solicitation. Now, more than fifteen years later, we are faced with the question of whether to vacate Hassine's conviction by granting his petition for habeas relief brought pursuant to 28 U.S.C. S 2254. Hassine contends that relief is warranted because the state prosecutor sought to use his post-arrest silence for impeachment purposes at trial in violation of the due process principles established in Doyle v. Ohio, 426 U.S. 610 (1976). The district court found that a Doyle violation had occurred, but it concluded that any constitutional error was harmless under the standard announced in Brecht v. Abrahamson, 507 U.S. 619 (1993). We agree that the prosecutor violated Doyle by seeking to elicit testimony concerning Hassine's post-arrest silence. We also agree that Brecht is the proper standard to apply on collateral review. Because we agree further that the Doyle violation was harmless under Brecht, we will affirm.

I. FACTUAL AND PROCEDURAL HISTORY

A. The Murder Conspiracy

This case arises out a conspiracy involving Hassine and his co-conspirators George Gregory Orlowski and William Eric Decker, which culminated in the August 22, 1980,

2

murder of James Puerale and the shootings of Albert "Skip" Kellet and Lois Kellet.

The evidence at trial showed that Hassine first met Orlowski in 1979, and that shortly thereafter they decided to open a store in Morrisville, Pennsylvania, called Greg's Quality Meat Market ("the Market"). The store was financed by Hassine's family, overseen and supervised by Hassine himself, and operated on a daily basis by Orlowski. However, the Market soon experienced financial problems, and, with Hassine's knowledge, Orlowski began selling marijuana and methamphetamine from a back room in the store.

In June 1980, Albert Kellet, a close friend of Orlowski, purchased $150 of methamphetamine at the Market. Upon returning home, Kellet discovered that the drugs were of inferior quality and he became enraged. He called Orlowski and invited him to his apartment under the false pretense of wishing to buy more methamphetamine. When Orlowski arrived, Kellet threatened him with a club, stole all of his money and drugs, and threw him out of the apartment.

Several days later, Orlowski, Hassine, and Decker, among others, met at the Market to discuss Kellet's actions. The State's witnesses testified that at this meeting, Hassine announced that he wanted Kellet "wasted" and that if Lois Kellet, Albert's wife, was present, she "was to go also, because any witnesses had to go." As a result, Hassine, Decker, and Orlowski made several attempts over the next month to obtain a gun with which to kill Kellet, and they investigated the possibility of paying two other individuals to have Kellet murdered. A number of confrontations between Hassine and Kellet also erupted during this time, and, on at least one occasion, Hassine instructed Decker to shoot Kellet and to kill him. Because it was daylight and a witness was present, Decker declined. Nevertheless, on August 22, 1980, Decker had his own encounter with Kellet, and he returned to the Market to tell Hassine that "[t]onight's the night -- the cat's got to go. We'll use your gun."

According to the State's witnesses, Hassine picked Decker up later that evening and drove him to Hassine's

3

parents' house in Trenton, New Jersey. While Decker waited in the car, Hassine entered the house and obtained his father's .380 caliber Llama handgun. Hassine then drove Decker to Kellet's apartment building and gave him the gun and a New York Yankees batting helmet to cover his hair. As Decker approached the building, he saw Kellet in a first-floor apartment watching television with his wife Lois, and with James Puerale and George Sofield. Decker entered the apartment, surveyed the room, and opened fire, killing Puerale instantly and injuring Skip and Lois Kellet with shots to the head.

The police arrested Decker the next day, and arrested Hassine three months later, charging Hassine withfirst degree murder, attempted murder, conspiracy, and solicitation.

B. The Murder Trial

The State presented thirty-four witnesses at Hassine's trial, including Decker, who had negotiated a plea bargain with the District Attorney to avoid the death penalty. Decker and the other witnesses testified as to the details of the murder conspiracy and described Hassine's extensive involvement in the plot to murder Kellet.

Hassine then took the stand in his own defense and, for the first time since his arrest, offered an innocent explanation for his role in the conspiracy. He testified that he had obtained his father's gun and stored it in the Market after Orlowski had asked him for protection from Kellet. He then claimed that Decker entered the Market on the day of the murder, and, without Hassine's knowledge, took the gun and left the store "ranting and raving, saying he was going to get Skip Kellet." Hassine thus maintained that he never told Decker to kill Kellet, that he never gave Decker a gun with which to carry out the crime, and that he was never part of the murder conspiracy.

Attempting to discredit these claims, the prosecutor asked Hassine a series of questions on cross-examination regarding Hassine's post-arrest silence. In particular, he inquired three times as to why Hassine had not offered the same exculpatory story to the authorities following his

arrest. Hassine's attorney objected each time, believing that the questions violated Hassine's rights under Doyle v. Ohio, which provides that the government cannot use a defendant's post-arrest, post-Miranda silence for impeachment purposes at trial. 426 U.S. at 610. The trial judge agreed, sustaining the objections and preventing Hassine from answering the prosecutor's questions. The prosecutor also made two general references to Hassine's silence in his closing argument. Nevertheless, the court did not provide curative instructions during Hassine's testimony or in the jury charge.

The case was sent to the jury at the close of all evidence, and on June 11, 1981, the jury found Hassine guilty and recommended that he be sentenced to life in prison on the charge of first degree murder. After denying Hassine's motions for a new trial and arrest of judgment, the court adopted the jury's recommendation and sentenced Hassine to life imprisonment, in addition to several consecutive prison terms extending from two to twenty years.

C. Review of the State Court Conviction

Hassine appealed his conviction to the Superior Court of Pennsylvania, assigning fifteen reversible errors to the trial court. See Commonwealth v. Hassine, 490 A.2d 438, 443-44 (Pa. Super. Ct. 1985) ("Hassine I"). Among other things, he argued that the state prosecutor had violated the due process principles established in Doyle by interrogating him on the witness stand about his post-arrest silence. On February 8, 1985, the Superior Court denied Hassine's appeal in its entirety and affirmed his sentence,finding that his list of alleged errors was "short on merit," id. at 444, and rejecting his claim of prosecutorial misconduct based on Doyle. Relying on state precedent, the court noted that testimony regarding post-arrest silence can be elicited "to refute contrary statements volunteered by the defendant to demonstrate his cooperation at the time of questioning," id. at 451 (quoting Commonwealth v. Bey, 439 A.2d 1175, 1177 (1982)), and concluded that "[w]e believe this occurred here. The district attorney elicited testimony designed to rebut [Hassine's] claim that he cooperated with the police,

not to suggest [Hassine's] guilt to the jury. Hence we find no error." Hassine I, 490 A.2d at 451.

On May 13, 1985, Hassine applied for a Petition for Allowance of Appeal in the Supreme Court of Pennsylvania, claiming again, inter alia, that the prosecution asked improper questions at trial about his post-arrest silence. On April 15, 1986, however, the state Supreme Court denied the Petition and Hassine's conviction became final.

Hassine chose not to seek a writ of certiorari from the Supreme Court of the United States, but instead filed a petition for a writ of habeas corpus with the district court on October 28, 1986. Among other things, Hassine argued once again that the prosecutor had exploited his post-arrest silence as an impeachment tactic in violation of due process and Doyle. The district court referred the petition to a Magistrate Judge for a Report and Recommendation in accordance with 28 U.S.C. S 636(b)(1)(B), and on June 15, 1988, the Magistrate Judge recommended that relief be denied. After reviewing the record in detail, the Magistrate Judge found strong evidence "that the jury may have impermissibly been able to draw an inference between petitioner's silence and his guilt, thus clearly infringing upon petitioner's due process rights as established in Doyle." Nevertheless, he concluded that any constitutional error was harmless, because "[t]he evidence against Hassine was overwhelming."

Hassine filed several objections to the Report and Recommendation, and the district court granted de novo review of the Magistrate Judge's findings consistent with 28 U.S.C. S 636(b)(1)(C). One year later, on November 15, 1989, the district court issued a Memorandum and Order agreeing with the Magistrate Judge's ruling that the jury had been permitted "to draw an impermissible inference of guilt from Hassine's silence" in violation of Doyle and its progeny. Hassine v. Zimmerman, No. Civ. A. 86-6315, 1989 WL 140491, at *5 (E.D. Pa. Nov. 15, 1989) ("Hassine II"). However, the district court withheld a final decision on Hassine's petition, because it believed that oral argument was needed on the question of whether the trial error had been harmless.

6

Oral argument was held on December 1, 1989, but the court did not immediately issue a ruling, and no further events transpired in the case for the next three and a half years. On April 21, 1993, the Supreme Court announced its decision in Brecht v. Abrahamson, 507 U.S. 619 (1993), altering the standard for harmless error in habeas cases involving constitutional trial flaws. Prior to Brecht, the Court had held in Chapman v. California that habeas relief should be denied in the event of constitutional trial error only if the prosecution could prove that the error was "harmless beyond a reasonable doubt." 386 U.S. 18, 24 (1967). In Brecht, however, the Supreme Court announced a new test for harmless error in habeas cases, namely, whether the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). If not, habeas relief should be denied.

Realizing the potential impact of the new standard on Hassine's petition, the district court scheduled a July 29, 1993, conference call to discuss several matters, including "the significance, if any" of the Supreme Court's decision in Brecht. Following that call, the parties submitted letter briefs to the district court regarding whether Hassine's claims should be evaluated under Brecht or Chapman and whether harmless error could be found under either standard. However, two more years passed, and on May 4, 1995, the district court conducted yet another oral argument concerning whether Brecht should be applied to Hassine's petition. Still, no decision issued, and the parties filed at least ten additional letter briefs in the ensuing two years.

Finally, on October 30, 1997 -- more than eleven years from the date on which Hassine first filed his habeas petition -- the district court reached a decision on the merits of the harmless error claim. The court examined the caselaw and the rationales supporting the rule in Brecht and concluded that "[t]his court must apply the Brecht standard" to Hassine's petition for relief. Hassine v. Zimmerman, No. Civ. A. 86-6315, 1997 WL 677152, at *5 (E.D. Pa. Oct. 30, 1997) ("Hassine III"). After conducting an extensive review of the record and the evidence supporting

7

the jury's verdict, the court then held that the Doyle error at Hassine's trial was harmless, because "the record, considered as a whole, demonstrates that the direct and circumstantial evidence of [Hassine's] guilt was overwhelming." Id. at *7. The court determined that "the prosecutor's improper reference to Hassine's post-arrest silence, although a constitutional violation under Doyle, did not have a substantial and injurious effect or influence on the jury's guilty verdict" within the meaning of Brecht. Id. at *10.

The district court issued a certificate of probable cause allowing Hassine to file a timely appeal, and we now have jurisdiction to hear the appeal pursuant to 28 U.S.C. SS 1291 and 2253.1 Because the district court relied entirely on the state court record and did not hold an evidentiary hearing, our review is plenary. See Johnson v. Rosemeyer, 117 F.3d 104, 109 (3d Cir. 1997). Acting in the same capacity as the district court, we will presume that the factual findings of the state courts are correct if fairly supported by the record, but we will exercise plenary review over state court conclusions on mixed questions of law and fact and pure issues of law. See Ahmad v. Redman , 782 F.2d 409, 412 (3d Cir. 1986).

II. THE DOYLE VIOLATION

The Supreme Court established in Doyle v. Ohio that it is improper for a prosecutor to cause the jury to draw an impermissible inference of guilt from a defendant's post-arrest silence. 426 U.S. at 610. Doyle involved two defendants who, upon taking the witness stand in their own defense, claimed that a narcotics informant had framed them for the crime. The prosecutor asked each defendant on cross-examination whether he had told the "framing" story to the police after his arrest. Defense counsel objected strenuously, arguing that the prosecution could not impeach the defendants on this basis because

_____

1. This case is not subject to the terms of the Antiterrorism and Effective
Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), because Hassine filed his habeas petition well before the April 24, 1996, date on which the AEDPA took effect.

the defendants were merely exercising their right to remain silent after arrest. However, the objections were overruled and the defendants were compelled to admit that they had not provided an exculpatory story to the authorities following their arrests and the reading of their Miranda rights.

On appeal, the defendants argued that the prosecutor's line of questioning violated the due process guarantees inherent in the right to remain silent. The Supreme Court agreed, reversing their convictions in light of Miranda's implicit assurance that silence will have no adverse consequences. The Court stated that "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." Id. at 618. Therefore, the Court held, "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." Id. at 619.

In this case, we believe that the state prosecutor violated the due process principles established in Doyle  by seeking to elicit testimony about Hassine's post-arrest, post-Miranda silence. The record shows that the prosecutor's cross-examination of Hassine proceeded as follows:

```
Prosecutor:  How long have you been sitting in jail, sir?
Hassine:     Close to seven months.
Prosecutor:  And you have been sitting in Bucks Country
             Prison?
Hassine:     No, sir.
Prosecutor:  You were in Bucks County Prison for a time?
Hassine:     About a month and a half.
Prosecutor:  You were sitting in Holmesburg Prison?
Hassine:     For about five months.
Prosecutor:  And another prison?
Hassine:     Delaware County.
Prosecutor:  And conditions are not very good?
Hassine:     No, sir.
Prosecutor:  You sat for seven months in prison with the
             knowledge of what was really involved in
             regard to this gun, and you just kept it to
```

```
       yourself because your attorney said to keep it
       to yourself?

  Hassine's Attorney:  Objection.
  The Court:           Sustained.

Prosecutor: But you kept it to yourself until you came in
            to a court of law today and said it for the first
            time, in any event, outside of perhaps your
            family or your lawyer?

  Hassine's Attorney: Objection.

Prosecutor: For the first time?

  Hassine's Attorney:  That is objected to.
  The Court:           Sustained.
```

On three occasions, and over three objections, the prosecutor asked Hassine why he had remained silent about the crime after his arrest and after Miranda warnings had been given. It is clear from these questions that the prosecutor was attempting to elicit the precise inferences that the State is prohibited from exploiting under Doyle. Further, the trial court did not provide, and defense counsel did not request, any curative instructions for the jury. In this regard, the instant case is distinguishable from Greer v. Miller, 483 U.S. 756 (1987), where the Supreme Court found no Doyle violation. In Greer, the sequence of events "-- a single question, an immediate objection, and two curative instructions -- clearly indicate[d] that the prosecutor's improper question did not violate [the petitioner's] due process rights." Id. at 766. Here, the prosecutor asked questions concerning the amount of time Hassine had spent in prison, questioned Hassine about the poor conditions he had experienced in confinement, and then, despite objections by the defense, asked three questions that are clearly prohibited by Doyle, and then made statements in his closing that could be understood to refer to that same silence. Moreover, the trial court gave no curative instructions at all. We thus find that the government violated Hassine's right to due process under Doyle.

In so ruling we reject the State's argument, and the view of the Pennsylvania Superior Court in Hassine I, 490 A.2d

at 451, that the prosecutor's questions were nonetheless permissible because Hassine had "opened the door" in his direct testimony to inquiries about his post-arrest silence. Hassine had told the jury on direct examination that his attorney had offered to make him "available to the police," by, for example, offering to present his father to the police "in connection with identifying the gun." The State contends that by asking Hassine about his post-arrest silence, the prosecutor was merely challenging Hassine's testimony as to his behavior following arrest by impeaching Hassine's claim on direct examination that he was "available" and willing to cooperate with the authorities.

The State's argument is based on an exception contained in footnote eleven in Doyle, which provides that "post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest." 426 U.S. at 619 n.11. As the Supreme Court explained, "[i]n that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." Id.

We agree that the State's argument has some allure under Doyle as a basis for the prosecutor to use Hassine's post-arrest silence for impeachment. However, we find, as the district court did, that Hassine's direct testimony was far too innocuous and ambiguous to constitute an exculpatory version that would justify the pointed cross-examination in this case. The Doyle footnote applies when a witness testifies on the stand to a version of events and indicates that he previously told that version to law enforcement. The government can then pursue its position that the story was not previously told, and may bring out on cross-examination the fact that the defendant was silent following arrest. As the one case cited in the Doyle footnote makes clear, "to be admissible, keeping silence must be much more than ambiguous. It must appear to be an act blatantly inconsistent with the defendant's trial testimony." United States v. Fairchild, 505 F.2d 1378, 1382 (5th Cir. 1975). In this case, however, there is no contention that Hassine described a version of events on the stand and

11

indicated that he had previously told that same story to the police. Rather, the only testimony which harkens back to Hassine's previous behavior deals with his declaration that he was "available" for further questioning. Hassine did not claim to have told the police an exculpatory story after arrest, did not imply that he had participated actively in the investigation, and never suggested that he had surrendered his right to silence by speaking directly with the authorities. The only relevance of the prosecutor's questioning to Hassine's previous silence, therefore, implicates his right to remain silent more than it constitutes questioning probative of his truth or credibility.[2]

The Doyle footnote exception only permits the prosecution to use post-arrest silence to impeach the credibility of the defendant's version of what he did following arrest; the government cannot use the silence to impeach the exculpatory story itself or to draw inferences suggesting the defendant's guilt. See Doyle, 426 U.S. at 619 n.11; United States v. Gant, 17 F.3d 935, 941 (7th Cir. 1994) ("[T]he government may use defendant's silence for the limited purpose of impeaching his testimony; it may not argue that the defendant's silence is inconsistent with his claim of innocence."); Alo v. Olim, 639 F.2d 466, 468 (9th Cir. 1980) (questions implying that the defendant's silence is substantive evidence of guilt are not permitted under the Doyle exception). In the present case, rather than simply asking Hassine if he had told his story to the police after arrest, the prosecutor asked incredulously, "[y]ou sat for seven months in prison with the knowledge of what was really involved in regard to the his gun, and you just kept it to yourself because your attorney said to keep it to yourself?" We believe that questions like this clearly invite

_____

2. Hassine's appeal thus differs greatly from Fairchild, where the court determined that post-arrest silence was admissible because the defense attorney had specifically asked the defendant if he had "cooperated fully with the FBI and U.S. Attorney's office in responding with anything that you all wanted." 505 F.2d at 1383; see also Leecan v. Lopes, 893 F.2d 1434, 1442 (2d Cir. 1990) (emphasis added) (finding that an inquiry into post-arrest silence was warranted where the defendant's testimony "left the clear implication that he had proffered his alibi to the police upon surrender").

the jury -- in violation of Doyle -- to reject Hassine's story and to infer that Hassine's post-arrest silence was a sign of his guilt.

Consequently, we conclude that the footnote eleven exception in Doyle is of no aid to the State. The prosecutor violated Hassine's right to due process at trial by seeking to draw impermissible inferences about Hassine's post-Miranda silence following arrest.

III. HARMLESS ERROR

Having found a violation of Hassine's federal constitutional rights, we turn next to the issue of whether the error at Hassine's trial can be characterized as harmless. The Supreme Court has identified two types of constitutional errors: structural and trial. See Arizona v. Fulminante, 499 U.S. 279, 306-10 (1991). "A structural error is a defect in the trial mechanism itself, affecting the entire trial process, and is per se prejudicial." Yohn v. Love, 76 F.3d 508, 522 (3d Cir. 1996) (citations omitted). By contrast, "trial error occurs during the presentation of the case to the jury, and may be quantitatively assessed in the context of all other evidence." Id. The Supreme Court has written that "Doyle error fits squarely into the category of constitutional violations which we have characterized as trial error." Brecht, 507 U.S. at 629 (quotation omitted). Therefore, we must assess whether the Doyle violation at Hassine's trial constitutes harmless error in the context of all the evidence presented by the State.

The nature of the harmless error inquiry, however, has been modified during the pendency of Hassine's habeas corpus proceedings, as discussed above. For many years, the standard in both direct and collateral appeals for determining whether a constitutional trial error was harmless was the test established in Chapman v. California, which held that a conviction would be vacated unless the government could prove that the error was "harmless beyond a reasonable doubt." 386 U.S. at 24. In 1993, however, the Supreme Court held in Brecht v. Abrahamson, 507 U.S. at 619, that harmless error in habeas cases should be judged instead by the standard for

13

nonconstitutional errors set forth in Kotteakos v. United States. Thus, under Brecht, habeas relief can now be granted on collateral review only if the constitutional trial error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 623 (quoting Kotteakos, 328 U.S. at 776).3

Ordinarily, this would present no problem on appeal, because we would apply the Brecht standard to a petitioner seeking habeas relief. In this case, though, Hassine argues that he is entitled to the benefit of the older, more stringent Chapman standard because no state court has ever evaluated his claim under Chapman on direct review. Before proceeding to an application of the harmless error test, we must therefore resolve the following threshold issue: should a federal court apply the Brecht standard for harmless error in a habeas case where the state courts have never conducted a review of the error on direct appeal under Chapman? The district court found that Brecht should apply regardless of the actions of the state courts, and we agree.

A. Whether Brecht or Chapman Should Apply

The federal courts remain divided as to whether Brecht or Chapman applies in a situation in which a habeas petitioner has never had his claim evaluated under Chapman on direct appeal. The Eighth Circuit, and at least two district courts, have concluded that the "rule announced in Brecht does not apply and that the Chapman harmless error standard is the appropriate test in this case." Orndorff v. Lockhart, 998 F.2d 1426, 1430 (8th Cir.

_____

3. Brecht adopts a more deferential standard on collateral review for cases involving constitutional trial errors. Nevertheless, the degree of the difference in practice remains to be seen as the new test is applied. As Justice Stevens, whose concurrence provided the decisive fifth vote in Brecht, noted, "[g]iven the critical importance of the faculty of judgment in administering either standard, however, th[e] difference [in emphasis] is less significant than it might seem . . . . In the end, the way we phrase the governing standard is far less important than the quality of the judgment with which it is applied." 507 U.S. at 643 (Stevens, J., concurring).

14

1993); see also Starr v. Lockhart, 23 F.3d 1280, 1292 (8th Cir. 1994); Lyons v. Johnson, 912 F. Supp. 679, 687–89 (S.D.N.Y. 1996), aff'd, 99 F.3d 499 (2d Cir. 1996); Rickman v. Dutton, 864 F. Supp. 686, 712 (M.D. Tenn. 1994), aff'd sub nom. Rickman v. Bell, 131 F.3d 1150 (6th Cir. 1997). By contrast, the Fourth, Fifth, Seventh, Tenth, and Eleventh circuits have all held that "Brecht, rather than Chapman, enunciates the appropriate standard for determining whether a constitutional error was harmless in a federal habeas challenge to a state conviction or sentence," regardless of the standard employed by the state courts. Hogue v. Johnson, 131 F.3d 466, 499 (5th Cir. 1997), cert. denied, ___ U.S. ___, 118 S. Ct. 1297, (1998);[4] see also Sherman v. Smith, 89 F.3d 1134, 1140–41 (4th Cir. 1996), cert. denied, ___ U.S. #6D6D 6D#, 117 S. Ct. 765 (1997); Brewer v. Reynolds, 51 F.3d 1519, 1529 (10th Cir. 1995); Tyson v. Trigg, 50 F.3d 436, 446–47 (7th Cir. 1995), cert. denied, 516 U.S. 1041 (1996); Horsley v. Alabama, 45 F.3d 1486, 1492 n.11 (11th Cir. 1995).[5] Hassine contends that we should not implement Brecht as we normally would, but that we should cling to the old Chapman standard, notwithstanding the new formulation handed down by the Supreme Court. However, we are unwilling to find an exception to Brecht's "standard formula," Tyson, 50 F.3d at 446, because we disagree with the four arguments that Hassine offers in contending that Chapman should apply.

First, the plain language of Brecht makes no distinction

---

4. A panel of the Fifth Circuit recently noted its disagreement with Hogue, but concluded that "we may not ignore the [Hogue] decision, for in this circuit one panel may not overrule the decision of a prior panel." Barber v. Johnson, 145 F.3d 234, 237 (5th Cir. 1998), petition for cert. filed, (U.S. Sep. 10, 1998) (No. 98–6001). Hogue thus remains good law in the Fifth Circuit.

5. Two courts passed on the issue after finding that the trial error would not have been harmless under either standard. See Lyons v. Johnson, 99 F.3d 499, 503 (2d Cir. 1996) ("[D]ue to the magnitude of the trial court's error . . . we need not decide whether . . . Chapman or Brecht is the appropriate standard to apply in this case."); Hanna v. Riveland, 87 F.3d 1034, 1038 n.2 (9th Cir. 1996) ("[W]e do not need to decide this issue because, even under Brecht's less stringent standard of review, the error cannot be deemed harmless.").

15

that requires us to employ Chapman on collateral review. The issue in Brecht was "whether the Chapman harmless-error standard applies in determining whether the prosecution's use for impeachment purposes of petitioner's post-Miranda silence, in violation of due process under Doyle v. Ohio, entitles petitioner to habeas corpus relief." 507 U.S. at 622-23 (footnote and citation omitted). The Court held that "the Kotteakos harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type." Id. at 638; see also id. at 623 ("[T]he standard for determining whether habeas relief must be granted is whether the Doyle error `had substantial and injurious effect or influence in determining the jury's verdict.' ") (quoting Kotteakos, 328 U.S. at 776). The Court never restricted the issues or the holding in Brecht to situations where a petitioner has already had his or her claim evaluated by the state courts under Chapman. Therefore, we are not persuaded that we should read an exception into Brecht's harmless error rule when no such exception is even implicit in the Court's opinion.

Second, in contrast to the views of some courts, we do not believe that we should regard the facts in Brecht as limiting the Court's holding to cases in which Chapman has previously been applied. Because the Court decided Brecht after the Wisconsin Supreme Court had already ruled on the harmless error issue under Chapman, several courts have viewed prior Chapman review as integral to Brecht's result.6 We disagree.

_____

6. For example, the Eighth Circuit has written that Brecht was "based largely on the notion that because the state courts can properly apply the Chapman harmless error standard on direct review, the federal habeas courts need only review those decisions under the Kotteakos harmless error standard." Orndorff, 998 F.2d at 1430. Likewise, the district court in Lyons stated that Brecht "was premised largely on respect for the actual, conscientious review of harmlessness performed by four prior courts -- both federal and state-- that applied Chapman." 912 F. Supp. at 689. These courts thus believe that Brecht intended to alter the harmless error standard only for those habeas cases which, like Brecht, involved a previous application of Chapman on direct appeal.

16

While the Court noted that "it scarcely seems logical to require federal habeas courts to engage in the identical approach to harmless-error review that Chapman requires state courts to engage in on direct review," 507 U.S. at 636, its holding was based primarily on a finding -- apart from the particular facts or history of the case -- that "the costs of applying the Chapman standard on federal habeas outweigh the additional deterrent effect, if any, that would be derived from its application on collateral review." Id.

In Brecht, the Court identified four considerations in justifying the application of a more relaxed harmless error standard for habeas petitions, including the States' interests in the finality of convictions, comity, federalism, and the recognition that "liberal allowance of the writ degrades the prominence of the trial itself." Id. at 635 (quoting Engle v. Isaac, 456 U.S. 107, 127 (1982)). The Court then reasoned comprehensively that:

> [o]verturning final and presumptively correct convictions on collateral review because the State cannot prove that an error is harmless under Chapman undermines the States' interest in finality and infringes upon their sovereignty over criminal matters. Moreover, granting habeas relief merely because there is a reasonable possibility that trial error contributed to the verdict, is at odds with the historic meaning of habeas corpus -- to afford relief to those whom society has grievously wronged. Retrying defendants whose convictions are set aside also imposes significant social costs, including the expenditure of additional time and resources for all the parties involved, the erosion of memory and dispersion of witnesses that accompany the passage of time and make obtaining convictions on retrial more difficult, and the frustration of society's interest in the prompt administration of justice.

507 U.S. at 637 (citations and quotations omitted). This analysis led the Court to conclude that "[t]he imbalance of the costs and benefits of applying the Chapman harmless-error standard on collateral review counsels in favor of applying a less onerous standard on habeas review of constitutional error." Id. at 637; see also id. at 637-38 ("The Kotteakos standard is . . . better tailored to the nature and

17

purpose of collateral review and more likely to promote the considerations underlying our recent habeas cases."). Thus, Brecht was clearly not premised on the notion that the state courts had already conducted a Chapman review of harmless error on direct appeal. The fact that the state courts may or may not have performed such a review was of minor importance to the Court's view that the Kotteakos standard should be applied consistently in collateral proceedings.

Third, contrary to Hassine's argument, we believe that the policy interests identified in Brecht are nonetheless implicated in cases where the state courts have not evaluated a petitioner's claim under Chapman. Hassine urges that we follow Lyons, in which a district court stated that Brecht should be used only when federal courts would be repeating Chapman analyses performed by the state courts, because it is only in these situations that the federal courts demonstrate a "lack of respect for state courts' ability as federal constitutional interpreters, and hence . . . violate obligations of comity and principles of federalism." 912 F. Supp. at 689; see also Barber, 145 F.3d at 238 (Dennis, J., concurring) (stating that the federal courts cannot defer "to the systemic values offinality, federalism, and comity . . . unless there has in fact been a good-faith State effort to protect constitutional rights by applying the Chapman standard").

Once again, however, we disagree. Finality, comity, and federalism do not turn on whether the state courts have performed a Chapman analysis, but depend, rather, on the fact that they have rejected a defendant's direct appeal. Indeed, a federal habeas court which overturns a state conviction on collateral review still upsets a State's interest in finality, and still raises federalism, comity, and trial process concerns, regardless of whether the state courts have previously identified the constitutional error or have performed a Chapman analysis on direct appeal.

In light of the Court's reasoning and holding in Brecht, it is anomalous to say that a Chapman standard should apply in any habeas case based on concerns such as federalism, comity, or finality. Brecht stands for the proposition that these concerns are to be advanced by employment of the

18

Brecht standard itself. Thus, not to apply Brecht, and to apply instead a less deferential standard, is to nullify not merely the policies that the Court has advanced, but the very import of the Brecht decision. In fact, the Supreme Court has repeatedly emphasized the importance of deference to State "sovereignty over criminal matters," Brecht, 507 U.S. at 637, and to the finality of criminal judgments, outside the context of Chapman. In Teague v. Lane, for example, the Court restricted the ability of habeas petitioners to establish new constitutional rules on collateral review, in part because the "[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system." 489 U.S. 288, 309 (1989). Likewise, in Wright v. West, the Court stressed the "significant costs" of habeas review. 505 U.S. 277, 293 (1992) (quoting Engle, 456 U.S. at 126). "Among other things," the Court wrote, "it disturbs the State's significant interest in repose for concluded litigation, denies society the right to punish some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." Wright, 505 U.S. at 293 (quotations omitted).

Therefore, while the absence of a state court Chapman review may make the considerations identified in Brecht less compelling, it certainly does not eliminate them. As our sister circuits have concluded, Brecht is still the general rule to apply in habeas cases, even in situations where the state courts never employ Chapman, because "principles of federalism, comity, and finality apply regardless of the harmless error standard used by the state court." Sherman, 89 F.3d at 1141; see also Tyson, 50 F.3d at 446 ("The reasons the Court gave in Brecht for adopting a less stringent rule are independent of the rule applied in the state appellate process.").7

_____

7. We do not mean to imply that habeas relief should be limited in the name of federalism and comity alone. We note merely that Supreme Court jurisprudence requires us to consider the systemic costs of applying certain standards on collateral review, and that, in this case, those costs are substantial even if the state courts never perform a Chapman analysis on direct appeal.

Finally, we note that we are wary of the practical impact of applying Chapman to every case where a prior Chapman review has not occurred. As the Seventh Circuit recognized in Tyson, "ordinarily . . . the state court will not have found any error and therefore will have had no occasion to apply any standard of harmless error. Brecht itself was a fluke in this regard; the state courts had considered the issue of harmless error and applied the Chapman standard." 50 F.3d at 446.[8] Consequently, any rule requiring Chapman to be used when the state courts fail to address harmless error would render Brecht inapplicable to the majority of habeas petitions and would "rob the decision of any general significance." Id. Given the substantial interests identified in Brecht, and given the reasoning of the opinion, we find it highly unlikely that the Supreme Court could have sanctioned such a result.

Cases like Brecht and Teague express the Court's belief that collateral review entails heightened deference and respect to the state courts, and we must follow governing precedent when it applies, as it does here. Accordingly, we hold that a federal habeas court performing a harmless error inquiry on collateral review must employ the standard for harmless error articulated in Brecht, even if the state courts have never reviewed the error on direct appeal under Chapman.

B. Whether Brecht Should be Applied to Hassine

Even if Brecht applies generally to collateral proceedings, Hassine contends that we should still review his claims under Chapman due to the unique and unusual facts of his case. In particular, he argues that Chapman review is appropriate here because (1) he forfeited the right to pursue an appeal in the Supreme Court when Chapman was still the law for harmless error on collateral review, and because

_____

8. The state courts may not use Chapman to evaluate harmless error on direct appeal if, as here, they conclude that there was no constitutional error and thus do not perform the harmless error analysis at all, if they find that the petitioner has defaulted procedurally on his claim, or if there is no opportunity to address the error because it is discovered only after the defendant has already exhausted his state appeals.

20

(2) the district court proceedings were marked by such extensive delay as to violate his right to due process.9 We are not persuaded by either contention.

First, the fact that Hassine made the deliberate choice to forego seeking relief in the Supreme Court is irrelevant. Hassine could not, of course, have anticipated an intervening change in the law, but that alone is insufficient to prohibit a retroactive application of Brecht on collateral review. Hassine made a tactical decision to bypass the Supreme Court and to proceed to the district court for habeas relief, and we will not reward that decision by employing a less stringent standard when reviewing his petition.

Second, while we agree that Hassine experienced excessive delay in the processing of his petition, we do not believe that he is entitled to habeas relief, including any altered standard for harmless error, even if the delay in the district court gave rise to a violation of his due process rights.10 In Heiser v. Ryan, 951 F.2d 559, 563 (3d Cir. 1991) ("Heiser I"), we acknowledged that a delay in certain collateral proceedings can violate a prisoner's fundamental right to due process. We reviewed the claim of a petitioner whose state action for post-conviction relief had been pending for nearly four years, and we stated that"delays in post-verdict process may violate the Due Process Clause. . . . The due process clause protects against more than delay in trial and sentencing. It guarantees as well the right to attack a conviction." Id.

After Heiser I was remanded to the district court, however, we clarified our earlier remarks by revisiting the

_____

9. Hassine also argues that his appeal is different because no state court has ever conducted a Chapman review of his claims. As we discussed above, however, we believe that this does not alter our analysis in determining whether Brecht applies.

10. While we certainly do not condone the extraordinary delay in processing Hassine's petition, we wish to make clear that we are not holding that the delay constituted a violation of due process. We hold merely that Hassine would not be entitled to relief through habeas corpus proceedings even if the delay did amount to a constitutional violation.

21

due process issue in a subsequent appeal. See Heiser v. Ryan, 15 F.3d 299 (3d Cir. 1994) ("Heiser II"). In Heiser II, we still recognized that excessive delay in state collateral proceedings could violate due process, but we made clear that while the defendant could seek damages against counsel responsible for the delay, a writ of habeas corpus was not the proper remedy in such a case. Id. at 307. In other cases, we have indicated that petitioners experiencing delay can seek a writ of mandamus to compel the district court to reach a decision on the habeas claim. For example, in Madden v. Myers, we addressed a petitioner's argument that mandamus was warranted where seven months had elapsed since the filing of the Magistrate Judge's Report and Recommendation without any action by the district court. 102 F.3d 74, 76 (3d Cir. 1996). We ultimately denied the request, but, in our only published opinion on this issue, we noted that the petitioner's claims of delay had "force" and were "of concern." Id. at 79. Moreover, we stated that "[a]lthough this delay is of concern, it does not yet rise to the level of a denial of due process," implying that at some point, delay by the district court could become so excessive as to warrant the issuance of a writ of mandamus. Id. (emphasis added).11  We are not alone in entertaining writs of mandamus due to extraordinary federal delay. See, e.g., Johnson v. Rogers, 917 F.2d 1283, 1285 (10th Cir. 1990) (granting a writ of mandamus after a fourteen-month delay by the district court); McClellan v. Young, 421 F.2d 690, 691 (6th Cir. 1970) (granting a writ of mandamus where the district court had delayed its habeas ruling pending a decision by the Supreme Court).12

However, while we have shown a willingness to issue

_____

11. In fact, a review of our unpublished opinions reveals that we routinely entertain mandamus petitions complaining of extraordinary delay in habeas corpus proceedings at the district court level.

12. We hasten to add that "[t]he remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances." Kerr v. United States Dist. Ct., 426 U.S. 394, 402 (1976). Thus, a habeas petitioner seeking mandamus in these cases must experience extraordinary delay, "must have no other adequate means to obtain the desired relief, and must show that the right to issuance is clear and indisputable." Madden, 102 F.3d at 79.

22

writs of mandamus and to entertain lawsuits for damages, we have never granted habeas relief because of a delay in the processing of a petition, and we decline to do so here. The federal courts are authorized to provide collateral relief where a petitioner is in state custody or under a federal sentence imposed in violation of the Constitution or the laws or treaties of the United States. 28 U.S.C.SS 2254, 2255. Thus, the federal role in reviewing an application for habeas corpus is limited to evaluating what occurred in the state or federal proceedings that actually led to the petitioner's conviction; what occurred in the petitioner's collateral proceeding does not enter into the habeas calculation. We have often noted the general proposition that habeas proceedings are "hybrid actions"; they are "independent civil dispositions of completed criminal proceedings." See, e.g., Santana v. United States, 98 F.3d 752, 754 (3d Cir. 1996). Federal habeas power is "limited . . . to a determination of whether there has been an improper detention by virtue of the state court judgment." Henderson v. Frank, No. 97–3041, 1998 WL 456254, at *9 (3d Cir. Aug. 6, 1998). As the Seventh Circuit has noted, "[d]elay in processing [a] collateral claim does not make the continued imprisonment of the defendant unlawful, and hence, does not warrant federal habeas corpus relief." Montgomery v. Meloy, 90 F.3d 1200, 1206 (7th Cir. 1996), cert. denied, ___ U.S. ___, 117 S. Ct. 266 (1996); see also Jackson v. Duckworth, 112 F.3d 878, 880 (7th Cir.) (stating that "federal habeas corpus cannot remedy a delay in state collateral proceedings because such an error has absolutely nothing to do with the reason for a defendant's confinement"), cert. denied, ___ U.S. ___, 118 S. Ct. 380 (1997).13

Therefore, to the extent that a petitioner wishes to claim that delay in the processing of a collateral petition violates due process, we hold that the petitioner's remedy, if any, is through such avenues as a lawsuit for damages or a writ of mandamus rather than through the habeas corpus

_____

13. Providing relief to a petitioner in state custody because of a delay in the federal courts would also greatly undermine principles of federalism and comity by disturbing a state court judgment due to a federal court error.

23

proceeding itself. In the case at bar, we thus conclude that Brecht still applies in evaluating whether the Doyle violation at Hassine's trial constituted harmless error.

C. Application of the Brecht Standard for Harm less Error

Having found that Brecht applies to Hassine's petition, we proceed next to an examination of whether the district court properly concluded that the prosecution's Doyle violation was harmless.14 Under Brecht and its progeny, a constitutional trial error is not harmless if the court is in "grave doubt" as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict. O'Neal v. McAninch, 513 U.S. 432, 436 (1995). "Grave doubt" exists when, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." Id. at 435. Moreover, it is "inappropriate to ask whether there was sufficient evidence to support the result, apart from the phase of the trial affected by the error. The correct inquiry is whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error." Yohn, 76 F.3d at 523 (citations omitted).

Hassine contends that the Doyle violation could not have been harmless because it went to the heart of his defense. He maintains that because he was the only witness testifying as to his version of the events, and because the Doyle error undermined his credibility, it necessarily had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623 (quoting Kotteakos, 328 U.S. at 776). In evaluating Hassine's claim, we must thus determine whether, and to what extent, the jury's decision to accept the State's version of the facts rather than Hassine's was influenced by the prosecutor's

_____

14. The district court also evaluated Hassine's claim under Chapman, stating in a footnote that "the record establishes sufficient evidence of Hassine's guilt to suggest that the Doyle error would have been harmless under the Chapman reasonable–doubt standard as well." Hassine III, 1997 WL 677152, at *10 n.8. However, we need not reach this issue because we have determined that Chapman does not apply.

Doyle violation. If the jury disbelieved Hassine and convicted him because of the Doyle violation, the error was not harmless and we will grant the petition. The crucial inquiry is the "impact of the error on the minds of the jurors in the total setting." Yohn, 76 F.3d at 523 (citing Kotteakos, 328 U.S. at 764). While the nature of the evidence against Hassine is important, we must also examine the phases of the trial affected by the error, and determine whether the error had a substantial influence on the verdict despite sufficient evidence to support the result apart from the error. See id. (citing Kotteakos, 328 U.S. at 765). In so doing, we must of necessity weigh the impact of evidence on the jury and cannot help but make a judgment as to how the jury would reasonably perceive Hasssine's version of events with and without the Doyle violation.

At the outset, we note our agreement with the district court's finding that the evidence, as mounted through a parade of Commonwealth witnesses, was substantial indeed. The witnesses testifying as to Hassine's planning of, and intent to commit, the crime were numerous, and their stories consistent.15 A number of witnesses testified to an initial meeting in which Hassine called for Kellet's execution. (N.T. 34, 111–12, 743–44, 756–57, 810, 822).16 Several witnesses also recalled that Hassine had actively searched for a weapon to carry out his plan: at the initial meeting, he demanded that the other employees try to procure a weapon (N.T. 36, 744, 774); he had discussed buying a .357 with Breed members Tuite and Schwab (N.T. 56–59, 555–57, 626–27); he asked his employee Ron Wharton to buy a gun and to participate in the plan to kill

_____

15. The Commonwealth put 34 witnesses on the stand. Among those witnesses central to the Commonwealth's case were: 1) Eric Decker, a sometime employee of Hassine's who shot the Kellets, Sofield, and Puerale; 2) Greg Orlowski, the manager and day–to–day owner of the Market; 3) Ron Wharton and Billy Hayes, employees at the Market; 4) Valerie Lynch, Decker's girlfriend; 5) Ron Tuite and Joseph "Critter" Schwab, members of the Breed motorcycle gang; and 6) Theodore Camera, a tenant of the Hassine family and a former classmate of Hassine's.

16. Ron Wharton recalled Hassine stating that, "He wanted him wasted. He had to set an example." (N.T. 744).

Kellet (N.T. 747, 760); and he visited his tenant Theodore Camera and asked Camera to find him a gun. (N.T. 485-86, 487-88, 490).

Hassine settled on a weapon for the shootings: a stolen .25 caliber automatic handgun. (N.T. 933). Both Decker and Wharton testified that Hassine gave Decker the .25 while the three were in the Market van. (N.T. 53, 749).17 Hassine and Decker also went to a gun store where Hassine bought a box of ammunition and signed for the purchase. (N.T. 59-60, 708-10).

After buying the bullets, Decker and Hassine drove by Kellet's house, where Hassine told Decker to shoot him then and there with the .25. (N.T. 61). Decker declined because it was daytime, and a witness was present. (N.T. 61-62). Hassine and Decker repeatedly test fired the gun into the back wall of the store, but the .25 was malfunctioning and had to be put aside, despite their attempts to fix it. (N.T. 58-60, 62-63, 750-52, 811-12).18

Hassine and his co-defendant Orlowski also met with Breed members Tuite and Schwab to discuss killing Kellet. After bailing Tuite out of jail on a gun charge involving the .357, Hassine contacted him about a "deal" involving Kellet, and the four met to discuss a contract killing. (N.T. 557, 560, 560-61, 562, 627, 630, 753-55).19 Tuite and Schwab's asking price of $1500 was too high, however, so the four agreed instead that they would beat Kellet up for $500 ($250 credit for the bail and $250 for the beating). (N.T. 560-62, 563, 628-629, 632).20 Rather than attack Kellet, as

_____

17. Decker testified that Hassine handed him the gun and stated "here, hit him in the head and leave it there." (N.T. 53).

18. The .25, a spent shell, and photos of the holes in the Market wall were entered into evidence. (N.T. 51-52, 792-97, 800-01).
19. Both Tuite and Schwab testified that Hassine appeared upset and angered by the challenge Kellet posed to his authority. Tuite: "Hassine was pissed off--pissed off that somebody would step on his toes." (N.T. 563). Schwab: Hassine was "ruffled because somebody messed with one of his boys." (N.T. 628).

20. Schwab mentioned that Orlowski and Hassine wanted to continue to consider the possibility of killing Kellet for money: "They were haggling back and forth about the fifteen hundred bucks, so I took the two fifty. They wanted a night to think about if it was worth fifteen hundred bucks to waste Kellet." (N.T. 629-30).

agreed, however, Tuite and Schwab decided to warn Kellet that Hassine and Orlowski wanted to kill him and kept the $250. (N.T. 566, 630).21

The Commonwealth also presented evidence of Hassine's conduct both at and after the incident that pointed to his guilt. On the night of the shootings, Decker testified that he met Hassine at the market and said, "Tonight's the night-- this cat has got to go. We'll use your gun. I want two hundred and fifty dollars." (N.T. at 77, 218-19). Hassine agreed and said he would come back to pick Decker up with his car. Id. Decker further testified that Hassine then drove him to Trenton and retrieved the .380 Llama handgun used in the shootings from his parents' house; gave him directions to Kellet's house; told him that he would wait for him and drive him away after the shootings; and gave him a Yankees batting helmet to disguise himself during the shootings. (N.T. 83-85, 87-88).

Hassine then went to Orlowski's house, where Hassine and Orlowski met a third person, Michael Thompson ("Thompson"), who testified that all three got into his car. (N.T. 861-63). Hassine was carrying a metal pipe. (N.T. 870). Hassine told Thompson to drive to the parking lot across the street from Kellet's residence and then to other locations; Hassine whistled out the window from time to time, and at one point Hassine told Thompson to get out of the car and call for "Eric". (N.T. 863-870, 874-884, 905-07).22 In the course of their drive, they heard two shots, and Hassine stated, "Oh shit, that's my father's gun, I hope that asshole doesn't get caught." (N.T. 868-69, 881, 1224).

After the murder, when Hassine and Orlowski returned from their attempts to find Decker, Hassine told Orlowski that they still had to find Decker, because he was afraid Decker would be arrested. (N.T. 1227-28). The following morning, Hassine told his employee Wharton to drive the pair to Decker's apartment, so they could try once again to retrieve the .380 from Decker. (N.T. 761). When they

_____

21. Hassine later complained that Tuite and Schwab had "ripped him off." (N.T. 755).

22. In the course of their drive, the three went to the Dunkin' Donuts, where Hassine mentioned that they had been seen. (N.T. 867).

27

realized Decker had been arrested, Hassine told Decker's girlfriend, Valerie Lynch, to get rid of the gun. (N.T. 761-63, 1043-44, 1046-47). As word spread that the case against Hassine was building, Tuite and Schwab decided to try to intimidate Hassine into giving them $10,000 to kill Commonwealth witnesses, and Hassine considered their demands but did not ask them to follow through on the plan.23 (N.T. 568, 572, 577-78, 631-32).

Not only did the Commonwealth's case present evidence of Hassine's guilt but also evidence of both a coverup and instances of lying that detracted from Hassine's credibility. On the night of the shootings, Hassine told his co-defendant Orlowski to keep his "mouth shut" if the police questioned him. (N.T. 1228). Hassine's attempts to influence others continued as the investigation intensified. After Decker was arrested for the shootings, Hassine tried to make Orlowski sign a statement holding him responsible for the crimes, and the two held practice sessions in which Hassine and Orlowski practiced Orlowski's story. (N.T. 1388-90). Valerie Lynch testified that Hassine told her to lie about his and Decker's whereabouts the night of the shootings, saying: "Remember, Valerie, I was in New York, and Eric Decker was at home." (N.T. 764-65, 1051-52). In the course of an intercepted phone conversation, Hassine queried Thompson about what Thompson had told the police during questioning, and in the course of that conversation the two agreed, ostensibly, that they would keep each other out of the case.24 (N.T. 892-94, 901).

_____

23. Schwab testified as follows:

    He was all frazzled; he was confused -- "I can't think--I don't know
        what to do" -- imbalanced -- all that shit, and he walked around.
        He said he would talk to his old man to see if he could come up
        with some bucks.

    Q: Did you talk to him any more after that, Mr. Schwab?

    A: Yeah -- one more time . . . . I told him the pressure was coming
        down on him. And he said he would try again to get the money. I
        told him I would take a van load of steaks--pack the van with
        steaks and give me five grand. (N.T. 631-32).

24. V: So, as far as they're concerned, you know, you were with somebody else that night, right?

28

Hassine had made promises to Decker as a part of his agreement to kill Kellet -- an apartment, money, and a future on "easy street" -- and he continued the practice of offering money or services for cooperation from others after the shootings had taken place. (N.T. 63, 111, 752-53, 773). In the course of the conversation in which he urged her to lie, Hassine also promised Lynch that he would help her and her child out with money, cuts of meat, or anything else she needed. (N.T. 1052). Hassine also promised Thompson, in the course of their intercepted phone conversation, that Thompson should look into buying Kellet's house, and that the two could enter into a deal whereby Hassine would put up the money for the house and the surrounding property, and Thompson could keep the house while Hassine developed the lot. (N.T. 896-97, 897-900). In his own testimony, Hassine admitted that he had no intention of buying the house or developing the lot, but he was making the promise because he wanted to know what Thompson told the police. (N.T. 1563-64).25

Notwithstanding the weight of the evidence presented by the prosecution, we would have little difficultyfinding that the Doyle violation had substantially influenced the jury if, apart from the violation, the phase of the trial most directly impacted, namely, Hassine's testimony, presented a strong counter to the state's evidence. But that is not the case. Hassine's story was undermined not only by evidence of his

_____

M: Yeah, as far as they're concerned I wasn't even with you.

V: You weren't.

M: Yeah. (N.T. 901).

25. The weaknesses of the Commonwealth's witnesses were exposed in the course of both direct and cross-examination. Decker was cross examined on his frequent use of methamphetamine, prior record, shifting stories, and his cooperation with the Commonwealth. (N.T. 116-17, 130-32, 132-35, 136, 138, 215). Other witnesses were questioned about their prior denials to the police, changes in accounts, drug usage, conflicts with Hassine, bias in favor of Orlowski, or reluctance to testify.
(N.T. 569-70, 632-33, 769-71, 784-86, 787-88, 789, 789-90, 872, 903, 963-64). As such, the jury had ample opportunity to consider the credibility and relative sophistication of the Commonwealth's witnesses.

29

disregard for the truth, but by his own testimony in which he set forth strained and unrealistic explanations for his conduct and portrayed himself as a mild mannered store manager and law student -- a portrayal strikingly at odds with other evidence depicting his behavior as controlling, crude, and vulgar. In the course of his testimony, Hassine portrayed himself as a diligent law student who spent the bulk of his summer studying for the New Jersey and New York bar exams, which he did not pass. (N.T. 1436-38, 1450-52). Hassine also presented himself as a sophisticated individual versed in business practices who was concerned about the management of the market. Hassine testified that he made Orlowski run the store efficiently, and that he had threatened to close the store if Orlowski did not run it in a cost-effective manner. (N.T. 1414-1422, 1492-93). He also testified that he was aware of the drug dealing at the store after Kellet had beaten and stolen money from Orlowski, but that he never participated in or profited from the drug dealing. (N.T. 1424, 1510).26 He testified that when Wharton took $40 from the register to front a drug deal, he punched him, but did so because he wanted nothing to do with Wharton's activities. (N.T. 1426-27, 1492-93).

Hassine denied having any feud with Kellet, having any animosity toward Kellet, or saying that he wanted Kellet killed or "wasted," claiming instead that he had only wanted Kellet to be put in jail. (N.T. 1428-29, 1432-34, 1496, 1497-98, 1500, 1553).27 Hassine also testified that by saying he wanted to make an "example of Kellet," he meant that any time Kellet made any motion toward him or any contact with him the police should be called. (N.T. 1429).

Hassine also testified that he had, in fact, rebuffed Tuite and Schwab's offer to kill Kellet for him by indicating that

_____

26. Wharton had testified that Hassine insisted that the drugs be "cut" to increase profits. (N.T. 780-81). Hassine also referred to Thompson as "Mr. Reds" in his testimony and in the course of the recorded conversation played for the jury. (N.T. 1470, 1507-08).

27. Kellet himself testified to the pattern of escalating threats and harassment between himself, Orlowski, and Hassine prior to the shootings, as well as prior tensions between himself and Hassine. (N.T. 382-83, 394-99).

30

the situation with Kellet was being handled by the police. (N.T. 1455-59). Hassine claimed to have no idea why Tuite and Schwab would think he would want Kellet killed. (N.T. 1455, 1492).

Hassine admitted that he had engaged in a complex course of behavior involving guns, but testified that his search for a weapon was undertaken in order to find adequate protection for the store. He conceded that he had contacted Camera about obtaining a gun, even though he knew he could purchase a gun legally; that he had bought bullets and signed the register at the gun store because Decker had asked him to do so, even though he knew that Decker was on probation for a gun charge; and that he had shot up the wall of the store with Decker because Decker wanted to demonstrate problems with the gun and he just got "carried away" in the process. (N.T. 1430-31, 1436, 1445-46, 1449-50, 1549-52, 1553, 1556-58). Hassine also explained his conduct on the night of the shootings as being motivated by his desire to get his father's gun back and to prevent a crime from occurring. (N.T. 1466-68, 1526-29, 1521-32).

Hassine's version of events was further undercut by evidence that he was not the mild-mannered person he portrayed himself to be. There was testimony as to his threatening and controlling Orlowski, his need to be a boss of others and his desire to protect his turf and his authority, even if doing so entailed resort to violence. (N.T. 488-89, 490, 555, 563, 628, 755, 783, 861-62, 816, 1051, 1441, 1454-55). Other evidence, some of which was conceded in Hassine's own testimony, demonstrated that Hassine had violent tendencies, through incidents such as his pulling Orlowski's finger out of its socket during an argument and punching Wharton, and through his practices of engaging in threats and feuding. (N.T. 382-83, 1498, 1508, 1556).

The Doyle violation occurred as a series of three questions in the midst of Hassine's testimony, and, later, in two ambiguous references to Hassine's silence in the prosecutor's closing argument. (N.T. 1543-1544, E.H. 223, 259-60). Based on our assessment of the trial evidence, we conclude that the questions posed in the midst of Hassine's

31

testimony did not have a substantial or injurious effect on the jury's verdict. Nor did the two ambiguous references made to a general pattern of silence result in an overemphasis on this silence that destroyed the jury's ability to look at the evidence in the case, as Hassine contends. Rather, these statements were couched within a general framework of asking the jury to consider the credibility of the witnesses as a whole, and as such, the closing provided the jury with ample latitude to evaluate Hassine's credibility and the evidence of his guilt apart from those particular statements.

While not minimizing the importance of the right at issue or condoning the prosecutor's conduct, we find that the actual effect of the Doyle violation on Hassine's credibility before the jury and the inferences drawn by that jury, and on the jury's determination of guilt or innocence, was minimal, as the improper questions and statements occurred within a contextual presentation of a story that was, on its own, not likely to be viewed as credible. Given the overwhelming evidence of Hassine's guilt, and his lack of credibility apart from the Doyle violation, we conclude that the constitutional error at Hassine's trial was harmless; there is little doubt that the prosecutor's Doyle violation did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 623 (quoting Kotteakos, 328 U.S. at 776).

D. The Footnote Nine Exception to Brecht

Hassine's final argument is that even if the Doyle error did not substantially influence the jury, he is still entitled to relief under an exception to the harmless error rule noted in Brecht. In footnote nine of the Brecht opinion, the Supreme Court stated:

> Our holding does not foreclose the possibility that in an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict. Cf. Greer v. Miller, 483 U.S.

32

756, 769, 107 S. Ct. 3102, 3110, 97 L. Ed. 2d 618
(1987) (Stevens, J., concurring in judgment).

507 U.S. at 638 n.9. Hassine contends that this casefits squarely within the Footnote Nine exception, because the state prosecutor committed a "deliberate and especially egregious error" at trial. He argues that "it was nothing other than deliberate for the very experienced prosecutor to persist in pointedly cross-examining Hassine about his post-arrest silence," and maintains that it was "anything short of deliberate" and egregious when the prosector commented on Hassine's post-arrest silence during closing arguments. (Pet'r Br. at 34 n.14.)28 However, after reviewing the origins of the Footnote Nine exception and the few cases in which it has been applied, we conclude that the prosecutor's Doyle violation did not rise to the level needed to warrant habeas relief.29

As the citation in Footnote Nine acknowledges, the exception to Brecht's harmless error standard has its roots in the views of Justice Stevens, who has written on several occasions that habeas petitions should be granted where trial errors are truly extraordinary, even if they are found to constitute harmless error. Brecht itself cites to Justice Stevens' concurrence in Greer v. Miller, 483 U.S. at 767, which, in turn, refers to the Justice Stevens dissent in Rose v. Lundy, 455 U.S. 509, 538 (1982). In Rose, Justice Stevens argued that there are at least four types of constitutional error:

> The one most frequently encountered is a claim that
> attaches a constitutional label to a set of facts that

_____

28. Hassine does not contend that the error falls within Footnote Nine's prohibition on errors "combined with a pattern of prosecutorial misconduct." Brecht, 507 U.S. at 638 n.9. He argues only that the Doyle violation was sufficiently "deliberate and . . . egregious" to warrant habeas relief. We will thus limit our analysis to this aspect.

29. It is worth noting that Brecht does not truly establish an exception for "deliberate and especially egregious errors;" it merely "does not foreclose the possibility" that such an exception could exist. 507 U.S. 638 n.9. Nevertheless, for purposes of this discussion, we will assume arguendo that Footnote Nine does support awarding habeas relief for egregious errors in an appropriate case.

does not disclose a violation of any constitutional right. . . . The second class includes constitutional violations that are not of sufficient import in a particular case to justify reversal even on direct appeal, when the evidence is still fresh and a fair retrial could be promptly conducted. . . . A third category includes errors that are important enough to require reversal on direct appeal but do not reveal the kind of fundamental unfairness to the accused that will support a collateral attack on a final judgment. . . . The fourth category includes those errors that are so fundamental that they infect the validity of the underlying judgment itself, or the integrity of the process by which that judgment was obtained.

Id. at 543-44 (dissenting opinion) (citations and footnote omitted).

It is, of course, this fourth category that the Court referenced eleven years later in Brecht as a potential exception to the harmless error standard. Justice Stevens has admitted that "[t]his category cannot be defined precisely," id. at 544, but his opinions in Rose and Greer do provide some guidance as to which infractions are to be considered `fundamentally' unfair. In Rose, Justice Stevens explained that the "error that falls in this category is best illustrated by recalling the classic grounds for the issuance of a writ of habeas corpus -- that the proceeding was dominated by mob violence; that the prosecutor knowingly made use of perjured testimony; or that the conviction was based on a confession extorted from the defendant by brutal methods." Id. (footnotes omitted). In his view, "[e]rrors of this kind justify collateral relief no matter how long a judgment may have been final and even though they may not have been preserved properly in the original trial." Id. (footnotes omitted). Further, in Greer, Justice Stevens applied these principles to Doyle violations, writing that "there may be extraordinary cases in which the Doyle error is so egregious, or is combined with other errors or incidents of prosecutorial misconduct, that the integrity of the process is called into question. In such an event, habeas corpus relief should be afforded." 483 U.S. at 769 (concurring).

34

Brecht itself sheds light on the Footnote Nine exception as well. Brecht involved a petitioner convicted of first-degree murder and sentenced to life imprisonment. The petitioner took the stand at trial and admitted that he had fatally wounded his brother-in-law, Roger Hartman, but he claimed that the killing was accidental. Over the objections of defense counsel, and in violation of Doyle , the State asked the petitioner on cross-examination and again on re-cross-examination "whether he had told anyone at any time before trial that the shooting was an accident, to which petitioner replied `no.' " 507 U.S. at 625. The prosecutor then made three glaring references to the petitioner's pre-trial silence during closing arguments, urging the jury to " `remember that Mr. Brecht never volunteered until in this courtroom what happened in the Hartman residence,' " stating that " `[h]e sits back here and sees all of our evidence go in and then he comes out with this crazy story,' " and reminding the jury that the petitioner " `didn't say' " this was an accident, " `[n]o, he waited until he hears our story.' " Id. at 625 n.2 (quoting the record in the case). Nevertheless, the Supreme Court still applied a harmless error standard, so that the facts in Brecht did not involve "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct" as reflected in Footnote Nine. Id. at 638 n.9. As the Court wrote, "[w]e, of course, are not presented with such a situation here." Id.30

With this in mind, we too conclude that we are not here presented with the type of egregious situation alluded to in Footnote Nine. First, the error in this case was much less

_____

30. We are aware of only two federal circuit court opinions discussing the Footnote Nine exception in detail, but neither of these cases is helpful to
our discussion. We addressed the Brecht exception in Robinson v. Arvonio, 27 F.3d 877, 886 (3d Cir. 1994), but Robinson was later vacated on appeal to the Supreme Court and is no longer good law. See Robinson v. Arvonio, 513 U.S. 1186 (1995). In addition, the Ninth Circuit discussed Footnote Nine in Hardnett v. Marshall, 25 F.3d 875, 879-81 (9th Cir. 1994), but, in contrast to the instant case, Hardnett involved an
error that was ultimately found to be irrelevant to the jury's verdict. We will thus limit our analysis to Supreme Court precedents discussing the Brecht exception.

egregious than in Brecht where the Court did employ a harmless error analysis. At Hassine's trial, objections were immediately raised and sustained, Hassine never answered the improper questions, and the prosecutor's references to Hassine's silence during closing arguments were ambiguous. See supra. Therefore, if the Supreme Court believed that Brecht was not "of course" a Footnote Nine case, we fail to see how Hassine's case could possibly qualify under the Brecht exception.

Second, we do not believe that the prosecutor's actions here were "deliberate and especially egregious" within the meaning of Footnote Nine. As we discussed supra, there was some evidence that Hassine had opened the door to questions about his post-arrest silence by testifying that he was "available" for questioning by the police. In fact, this is precisely what the Pennsylvania Superior Court found on direct appeal of Hassine's claim. See Hassine I, 490 A.2d at 451. Thus, while we now disagree with the Superior Court and find that the questions were inappropriate, we cannot say that the prosecutor's actions were so deliberate and egregious as to warrant habeas relief that bypasses harmless error scrutiny.

Finally, we conclude that the Doyle violation did not "so infect the integrity of the proceeding," Brecht, 507 U.S. at 638 n.9, or "call[ ] into question" the integrity of the trial process, Greer, 483 U.S. at 769 (Stevens, J., concurring), so as to warrant the grant of habeas relief to Hassine. As we have discussed, the Doyle violation in this case consisted of three unanswered questions, occupying just one page in a transcript of more than 1500 pages of testimony, in addition to two ambiguous references to Hassine's silence during closing arguments. Moreover, the State called thirty-four witnesses on its behalf and impeached Hassine's testimony on several different grounds. Under these circumstances, we do not believe that Hassine's case can be classified as the "unusual," Brecht, 507 U.S. at 638 n.9, or "extraordinary," Greer, 483 U.S. at 769 (Stevens, J., concurring), proceeding in which relief can be granted pursuant to Footnote Nine. The Doyle violation at Hassine's trial was significant, but we remain confident that its impact on the entire case was not so profound as to infect the very integrity of Hassine's conviction.

36

IV. CONCLUSION

For the foregoing reasons, the district court's Order dated
October 30, 1997, will be affirmed.

NYGAARD, Circuit Judge, Concurring.

I believe the majority reaches the correct result, agree with its reasoning, and, so I concur in its judgment. I write separately only to add my thoughts to Section III, D of its opinion, and express my indignation with the prosecuting attorney's misbehavior.

The concept of an accused's right to remain silent, to be free from prosecutorial comment about that silence, and to be free from any adverse consequences from accepting this constitutional protection, is so fundamental in our jurisprudence, and is so well known among practitioners, that I cannot conceive of any alternative but that the prosecutor's use of Hassine's silence was both deliberate and calculated to invite the jury to draw an adverse inference from it. Moreover, I believe this deliberate violation of Mr. Hassine's constitutional rights is egregious -- indeed, it is outrageous. The prosecutor not only questioned Hassine about his silence, but continued to do so even after objections to the questions were sustained by the trial court. This arrogance towards the court's ruling and the accused's rights, is reprehensible.

Nonetheless, on this habeas corpus review, I cannot say that his behavior, although unprofessional, "so infected" the trial's integrity, that it requires us to grant Hassine relief. Moreover, even though the prosecutor again made reference to Hassine's silence in his closing argument, considering the entire record, I agree with the majority -- we cannot say that his action constituted a "pattern" of misconduct. The prosecutor's act was unfair, for which he deserves a stern rebuke. Hassine, nonetheless, received a fair trial.

Hence, although the prosecutor's behavior came very close to crossing the line of harm, and came even closer to that "unusual" case in which relief could be granted regardless of harm, I agree with the majority that it did not.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit